**UNITED STATES v. GOLDSTEIN.**
No. 221, Docket 20931.

Circuit Court of Appeals, Second Circuit.

May 26, 1948.

Frederick J. Waters, of New York City (Richard J. Burke, of New York City, of counsel), for appellant.

John F. X. McGohey, U. S. Atty., of New York City (William M. Regan, Bruno Schachner, and John C. Hilly, Asst. U. S. Attys., all of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellant was tried by jury in the District Court for the Southern District of New York on an indictment in one count charging a violation of 18 U.S.C.A. § 231, i. e., charging perjury. He was convicted and sentenced to imprisonment for a year and a day and to pay a fine of $2000. His appeal raises questions as to the sufficiency of the evidence to establish all the elements of the crime by the necessary quantum of proof. It also calls for decision as to the effect of the appellant's introduction of evidence by way of defense on the merits after he had moved at the close of the government's case to dismiss the indictment for lack of proof and the motion had been taken under advisement by the court.

The perjury charged in the indictment was that appellant, David Goldstein, while being examined under oath administered by a duly authorized special agent of the United States Treasury Department in a proceeding to determine the tax liability of American Coated Fabrics Co., Inc., Aetna Coated Fabrics, Inc., David Rosen, Sydney Drooker, and the appellant himself, will-

fully testified falsely to matters material to the proceeding. His allegedly false testimony was, it was charged, "That stock certificates numbered 5, 6, 7 and 8 of the Aetna Coated Fabrics, Inc., of 30 East 20th Street, New York City, were issued in his name on October 2, 1941; whereas in truth and in fact, as the said David Goldstein then and there well knew and believed the said stock certificates numbered 5, 6, 7 and 8 of the Aetna Coated Fabrics, Inc., of 30 East 20th Street, New York City, were issued in his name subsequent to March 23, 1945."

The following undisputed circumstances which the tax investigation disclosed will show how the time when the above stock certificates were issued was significant. In August, 1945, when treasury agents were investigating the tax liability of the American Coated Fabrics Co., Inc., and that of Drooker and Rosen, its owners, certain duplicate invoices of Aetna Coated Fabrics were found in American's possession. These led the agents to suspect that Drooker and Rosen owned an interest in Aetna and might have received therefrom taxable income which they had failed to report on their returns. The investigation, therefore, was broadened to include the tax liability of Aetna and of the appellant, who was its president. It appeared that the appellant had been employed in 1937 by Drooker and Rosen to manage Aetna, which they had organized as a corporation with 750 authorized shares of capital stock, only 75 shares of which had been issued. The stockholders, appellant told the agents, were nominees of Drooker and Rosen, one Hillson having a certificate of 25 shares, one Shaw having one of 25 shares, and appellant having two of 12½ each. The nominees all indorsed their certificates in blank and the certificates were in the possession and control of Drooker and Rosen thereafter at least until October 2, 1941. Some time before that date the appellant had been made president of Aetna and until the fall of 1940 had been paid for his services a weekly salary ranging up to perhaps $100. But late in 1940 commissions on the gross sales of Aetna were credited to him on the books and he may have withdrawn some of them in addition to his weekly salary. By the fall of 1941 his salary had been substantially increased and commissions of 5% on the gross sales of Aetna were credited to him on the books. At irregular intervals he withdrew parts of this credit by checks drawn on Aetna. Each time the checks were cashed by or in behalf of the appellant, he turned over the greater part of their amounts to Drooker and Rosen. This practice was followed throughout the taxable years under investigation. The commissions so credited were deducted as business expenses by Aetna on its income tax returns and were reported by the appellant on his and the tax paid, but the part received by Drooker and by Rosen was unreported by them.

With this background the special agents suspected that the amounts received by Drooker and Rosen were in fact secret dividends upon which they were taxable and that at least that part of the commissions were not deductible as business expenses by Aetna. The explanation of the appellant for his division of commissions with Drooker and Rosen was in effect that in the fall of 1940 he felt that his management of Aetna entitled him to more remuneration than he had been receiving and that he ought to be allowed to purchase some of its stock. He talked with Drooker and Rosen and in January, 1941 the three came to an oral understanding substantially as follows. The appellant's salary was increased and he was given a five per cent commission on Aetna's gross sales. He was then to purchase one-third of the issued shares of Aetna for which he agreed to pay Drooker and Rosen two-thirds of the commissions after taxes for a period of five years, but he was not to receive the shares until the end of that period. Thus, the portions of each withdrawal of his commissions which he had shared with them were, he said, the payments he had agreed to make for the Aetna stock.

This explanation of the disposition of his commissions was not taken at face value and the special agents asked the appellant to produce Aetna's stock book. After some delay it was produced and turned out to be a loose-leaf binder with blanks not printed for use by any particular corporation. The first four certificates issued in 1937 as above indicated had been marked cancelled and

attached to their stubs with staples. Following in the book were the stubs of certificates Nos. 5, 6, 7, and 8 showing that all these four certificates had on October 2, 1941 been issued in the name of the appellant, Nos. 5, 6, and 7 each being for twenty-four shares and No. 8 for three shares. The book was delivered to a special treasury agent early in November, 1945 by an accountant employed by Aetna who had with him United States transfer tax stamps to put on the stubs of Nos. 5, 6, 7, and 8, there being no transfer stamps upon them, but he was denied permission then to affix the stamps.

During the proceedings above mentioned at which the appellant was interroga'ed under oath, he testified positively that all of the certificates numbered 5, 6, 7, and 8 had been issued on October 2, 1941 and that he had signed each certificate on that date as president of Aetna. He also testified that Drooker and Rosen were present when all these certificates were issued and that all the shares were then put in his name merely for the business purposes which had before been fulfilled by having the stock in the name of dummies, viz., to prevent the trade from knowing that Drooker and Rosen owned Aetna. It was thought, so appellant testified, that to transfer all the stock to the appellant would better serve the purpose of secrecy than to let some shares remain in the names of Hillson and Shaw.

At the trial below the prosecution, among other things, proved the above in substance and introduced evidence tending to show that, although the appellant had included the commissions withdrawn from Aetna in his gross taxable income and had paid the taxes thereon, the treasury would have been entitled to a greater tax if the tax liabilities of Aetna, Drooker, Rosen, and the appellant had all been computed on the theory that the amounts received by Drooker and Rosen were dividends paid to them as stockholders of Aetna. To show that certificates Nos. 5, 6, 7, and 8 had not been issued on October 2, 1941 but had been issued after March 23, 1945, Belskin, an employee of the New York State Department of Finance and Taxation, testified that on the latter date a representative of Aetna brought the stock book to his office for examination and that he then examined the book for the purpose of determining state tax liability. He also in the usual and regular course of the business of the state office then made a record on a card, provided for that purpose, showing the result of his examination. This card was duly filed as a part of the records in the office and was admitted in evidence in corroboration of the testimony of this witness. It gave substantial support to his testimony which was to the effect that at the time he inspected the stock book it contained only the stubs of certificates Nos. 1, 2, 3, and 4. Aside from those stubs, his testimony ran, the book showed no evidence of any certificates having been issued, the remaining pages all having been blanks.

The government rested upon the case thus made, with Belskin's testimony corroborated only by the record in his office that he himself had made substantially as above outlined. The appellant then moved for a dismissal on the ground that no prima facie case of perjury had been shown in that no false statement by the appellant of any fact material to the investigation had been proved and on the ground that in any event the testimony of the witness Belskin was not sufficiently corroborated to comply with the so-called two-witness rule in perjury cases. That rule is that the offense must be proved either by the direct testimony of two witnesses or by that of one witness supplemented by proof of corroborating circumstances. See Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495, 156 A.L.R. 496; 7 Wigmore on Evidence, 3rd Ed., § 2042.

The judge reserved decision on the motion and the appellant introduced evidence tending to show the following defense on the facts. Certificates Nos. 5, 6, and 7 had actually been issued on October 2, 1941 but through an oversight the aggregate number of shares they represented was only 72 out of the intended total of 75. It had been decided to put all of the stock in the appellant's name in 1941 and the mistake was not discovered until sometime in the fall of 1945. Then certificate No. 8, for the three shares not accounted for in the three pre-

ceding certificates, was typed in the office of Aetna's attorney and signed by the appellant after it had been pre-dated to October 2, 1941. During the defense's presentation of evidence, appellant's wife, Aetna's attorney, and both Drooker and Rosen were called and testified. From parts of their evidence the jury could have found that the four original certificates, Nos. 1, 2, 3, and 4, were in the possession of Drooker and Rosen when the agents began making their investigation and were not marked cancelled and attached to their corresponding stubs in the stock book until after the agents had demanded the production of that book; that the stubs of certificates Nos. 5, 6, 7, and 8 were not filled out until after the production of the stock book had been requested; and that Goldstein had not been accurate in some of the statements he made to the agents as to who was present in 1941 when the certificates were issued or as to who had then received them. At the close of all the evidence, the motion to dismiss was renewed and decision upon it was again reserved. The case was submitted to the jury and after its verdict the motion to dismiss was denied and judgment was entered on the verdict.

It is clear and indeed is conceded by the appellant that before Rule 29 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, became effective his motion to dismiss made at the close of the government's case would have been waived by his election to defend on the merits and his introduction of evidence to that end. Bogk v. Gassert, 149 U.S. 17, 13 S.Ct. 738, 37 L.Ed. 631; Epstein v. United States, 2 Cir., 271 F. 282. But the new Rule 29 provides:

"(a) Motion for Judgment of Acquittal. * * * The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. * * *

"(b) Reservation of Decision on Motion. If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. * * * *"

From the use of the words "shall order the entry of judgment of acquittal" in subdivision (a) without any express provision for the reservation of decision on a motion made or for delay in making the entry upon the court's own motion, the appellant argues that he is entitled to a reversal, because (1) his motion to dismiss made at the close of the government's case was well founded and (2) he was entitled to have it granted nunc pro tunc after delayed consideration without regard to anything which meanwhile occurred at the trial. We shall assume, without deciding, both that, as the evidence stood when the motion was made, the appellant was entitled to have his motion granted and that he could have insisted upon a ruling upon his motion, by virtue of Rule 29, before he elected to defend upon the merits. But he did not do that. To be sure, the court in reserving decision on the motion suggested that the disposition of the motion might not be affected by the appellant's introduction of evidence in saying, "Yes, I will hear you but let me tell you what I propose to do. It is a question with respect to which I don't want to give an answer on first observation, and my disposition or my tendency would be to reserve on that and let the defendant put in its proof. Of course, this being a criminal case, if the Government hasn't made out a case at the end of the Government's case, he would be entitled to a directed verdict or a dismissal even though some proof that he subsequently puts in may tend to corroborate you. I am not sure about that, but I think it is the situation. In other words your case must be complete at this moment, isn't that so, at least as far as the prima facie case is concerned." To this the prosecuting attorney replied, "I think your Honor might be in error on that particular point." To which the court rejoined, "I might be. Well, let me reserve on that question, so that there is a motion to dismiss at the end of the Government's case

remaining undisposed of." Counsel for the appellant then asked to be heard further and did amplify his argument in support of the motion on the merits but he made no point that he was entitled to a ruling before any evidence was introduced by the defense or any objection to the reservation of decision on the motion. He made no comment to indicate whether he did, or did not, take the view suggested by the court and immediately questioned by the district attorney that the introduction of evidence would be a waiver of the motion to dismiss. We do not understand that even now the position is taken that what was said misled appellant's trial counsel. At any rate it should not be treated as having done so, since at most it was but a tentative suggestion and left the appellant's trial attorney entirely free to pursue his own course upon his own responsibility. So we have a situation where the appellant elected to proceed with his defense on the merits without insisting upon first having a definite ruling upon his motion. The effect of that is, we think, the same as it would have been before the new Rule. On the assumption that it was erroneous not to grant the motion, the appellant could have taken his exception and declined to defend upon the merits. If the jury returned a verdict of guilty, he was in the same position he would have been had his motion been denied and could have vindicated his rights by taking an appeal. But no more now than before can he take advantage of an error if he makes that error harmless. In other words, if the evidence is short as the prosecution leaves it, he may take advantage of that. But if he amplifies the record on the facts in attempting to make a case for acquittal he must assume the risk of having the prosecution's case bolstered in the process. The new Rule does not attempt to make error in non-compliance with its terms any different in respect to waiver than any other error would be. What was said in Bogk v. Gassert, supra, is equally applicable now. "A defendant has an undoubted right to stand upon his motion for a nonsuit, and have his writ of error [appeal], if it be refused; but he has no right to insist upon his exception after having subsequently put in his testimony, and made his case upon the merits, since the court and jury have the right to consider the whole case as made by the testimony. It not infrequently happens that the defendant himself, by his own evidence, supplies the missing link; and, if not, he may move to take the case from the jury upon the conclusion of the entire testimony." 149 U.S. at page 23, 13 S.Ct. at page 739; see also Leyer v. United States, 2 Cir., 183 F. 102. No more than before the new Rule is a criminal trial to be allowed to turn upon but a part of the record actually made. Consequently, the motion to dismiss made at the close of all the evidence is the only one now open for consideration.

It is well settled that in prosecutions for perjury the testimony of one witness will not as a matter of law suffice to prove the commission of the crime beyond a reasonable doubt unless corroborating circumstances are shown to exist. See Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495, 156 A.L.R. 496. Without corroboration at least two living witnesses are necessary, as a general rule, to prove the offense adequately, though there are exceptional instances, not present here, where no living witness need testify.*

As the case stood when submitted to the jury there was evidence from two witnesses called by the appellant, as well as his own admission, that certificate No. 8 had been issued in the fall of 1945 to correct the mistake in making out certificates Nos. 5, 6, and 7 for only twenty-four shares each. After the special agents had called for the stock book during the investigation it had been discovered that the number of shares supposedly re-issued when the first four certificates were cancelled was three short and that No. 8 was then issued and signed by the appellant as president of Aetna to make up the original and intended number. This evidence, of course, fully satisfied the quantum rule as to proof of the appellant's having at least incorrectly testified under oath in the treasury proceedings that he had signed the

---

* See United States v. Wood, 14 Pet. 430, 10 L.Ed. 527.

certificate on October 2, 1941. And it was ample evidence to support a finding by the jury that he had willfully testified falsely about that certificate for he gave his testimony to the agents but a short time after he had actually signed the certificate.

■ The judge charged the jury that as a matter of law the time when the re-issue certificates were executed was material to the investigation of the tax liabilities. That, we think, was clearly correct. The purpose of the tax investigation was to determine the liabilities of the taxpayers for taxes or for filing fraudulent returns. Whether dividends had been taken from Aetna under the guise of commissions paid the appellant and in part transferred to Drooker and Rosen depended in large part, if not entirely, upon whether the appellant had actually made arrangements with them in 1941 to buy a one-third stock interest in Aetna and pay for it out of his commissions. Whether he had made such an agreement rested entirely upon his assertion and theirs. And they insisted that it was practically contemporaneous with the reissuance of all the stock in the appellant's name on October 2, 1941. Whether all the stock was then reissued was, of course not determinative of the question whether part of the Aetna stock was then bought by the appellant. But how the stock of Aetna was held at any time while the withdrawals called commissions were being made was a factor in determining what was the actual nature of those withdrawals. Though the investigation was not primarily concerned with the date when the stock was reissued, it was concerned with whether the appellant had purchased and been paying for any stock out of his commissions. At least one test of materiality is whether the false testimony had a tendency to make the investigators more ready to believe that the purchase had been made than they would have been had they known the truth about the reissuance of the shares in certificates all dated October 2, 1941. Had the appellant told the agents that those certificates, or at least one of them, had actually been issued after the beginning of the investigation and that they, or at least one of them, had been predated, it can hardly be questioned that it would have tended to make the investigators less willing to believe his representations about his purchase of and payment for some of the stock. His entire statement would have been reflected upon, and his credibility opened to doubt. Under these circumstances, his false testimony as to certificate No. 8 was material. Carroll v. United States, 2 Cir., 16 F.2d 951; Blackmon v. United States, 5 Cir., 108 F. 2d 572; United States v. Slutzky, 3 Cir., 79 F.2d 504; United States v. Shinn, C.C., 14 F. 447, 453. And it is of no consequence that a truthful statement by appellant might not have resulted in making the investigation more successful than it was. United States v. Hirsch, 2 Cir., 136 F.2d 976.

■ Since, then, there is ample evidence to support the verdict as to certificate No. 8, the judgment should stand. The sole count in the indictment charged the perjury as to each certificate. The court in its charge made it clear that the accusation was that the appellant testified as to all, making no distinction at any time except to say that, "There was somewhat different testimony concerning 5, 6, and 7, and concerning 8." The jury also charged that, "If you do not believe Belskin you do not have to pay any more attention to the case—you will acquit the defendant forthwith." Thus it appears that the jury actually found that the appellant willfully testified falsely as to all four certificates. Even if, as a matter of law, the evidence did not support the verdict as to certificates 5, 6, and 7, it did as to 8. That is enough. The single count charged perjury as to four certificates, that is, made four assignments of perjury in one count. The appellant did not request the withdrawal of any specific assignment of perjury. Rather, he moved for a dismissal of the entire indictment both at the close of the government's evidence and again at the close of all the evidence. That is not the equivalent of a request for a restricted submission. In the absence of such request and its denial, it is enough that one assignment in the count was adequately proved. United States v. Mascuch, 2 Cir., 111 F.2d 602,

672

certiorari denied, 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416.

Judgment affirmed.

L. HAND, Circuit Judge (concurring).

I agree with all that Judge CHASE has said, and I also think that Belskin's testimony, which was corroborated by Zeller's testimony upon the defense, was "direct" testimony that certificates five, six and seven had not been made out in 1941. If A swears that at a stated time there was an entry in a book, and B swears that he examined the book at that time, and that the entry was not there, I submit that B has "directly" contradicted A. Belskin swore that when he saw the book only blank certificates followed the first four stubs. Had it been a solidly bound book that testimony would have "directly" contradicted Goldstein, who said that certificates five, six and seven had been made out in 1941. I do not understand that Goldstein disputes this; but he answers that, since the book was not solidly bound, but of the loose-leaf kind, it was possible that at the time Belskin saw it, certificates five, six and seven may have been removed and were later replaced. That is theoretically possible, but so would it be theoretically possible in the example I have put, that a solid book might be substituted for the occasion. We should not for that reason require two witnesses to the identity of the book; we should allow the jury to find that it was the identical book on any reliable evidence. So here, the evidence is that this was the stock book of Aetna Coated Fabrics, Inc., and the jury was free to infer that it had not been tampered with for the occasion, just as they might, had it been a solid book. Were not some such latitude permissible in determining what is a "direct" contradiction, we should in effect insist upon two witnesses to every fact in a prosecution for perjury. I can find no warrant for any such dialectical extravagance, and I think that the verdict can stand as to all four certificates.

Judge AUGUSTUS N. HAND concurs in the foregoing opinion, as well as in the one by Judge CHASE.