**UNITED STATES of America, Appellee,**

v.

**Fred J. LIGHTE, Defendant-Appellant.**

**No. 84, Docket 85–1027.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 26, 1985.

Decided Jan. 31, 1986.

James D. Crawford, New York City (Brenda M. Nelson, Gary A. Kimmelman, Schnader, Harrison, Segal & Lewis, New York City, of counsel), for defendant-appellant.

Kathleen M. Mehltretter, Asst. U.S. Atty. for the W.D. of N.Y., Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This is an appeal from a conviction under a one-count indictment that charged appellant, Fred J. Lighte, with violating 18 U.S.C. § 1623 (1982) by knowingly making a false material declaration while testifying under oath before a federal grand jury. Appellant was found guilty after a jury trial in the United States District Court for the Western District of New York (Curtin, Ch. J.) and sentenced to two years probation and a $5,000 fine.

From ancient times bearing false witness has been deemed morally reprehensible. That truth is valued above the self-interest of falsehood is a tenet which the law enforces by holding that a violation of one's vow is a serious crime. But a perjury conviction which might have been based on questions that were ambiguous or on responses that were literally truthful may not be sustained. That was the case here. Hence, we reverse appellant's conviction and remand this case for a new trial.

## I BACKGROUND

### A. *Evidence at Trial*

Taken in the light most favorable to the government, the evidence at trial showed that in December 1981 the Buffalo Plasma Center Corporation (Buffalo Plasma or Center) located in Buffalo, New York was subject to a federal grand jury investigation. At issue was whether Buffalo Plasma had complied with Federal Food and Drug Administration regulations governing the collection of source human plasma and whether the Center had made false statements either directly to the FDA or indirectly through its corporate documents. The grand jury investigated the veracity of the corporation's records and those responsible for any misstatements they contained. Relevant to the inquiry was the identity of those who received a financial benefit from Buffalo Plasma's operations. Thus, the grand jury solicited information pertaining to the Center's ownership and control and inquired into the flow and distribution of the corporation's income.

The true owners of Buffalo Plasma cannot be conclusively determined. Appellant Lighte told the grand jury that Pedro Diaz and Robert LeVeque owned the business. But an application from Buffalo Plasma to

the New York State Department of Health listed Lighte as a stockholder as of June 1, 1978 and a subsequent form filed with the same Department dated November 22, 1978 again listed Lighte as an owner and designated him the company's Vice-President and Treasurer. In his grand jury testimony appellant denied being either a stockholder or an officer.

In any event, in 1978 Diaz and LeVeque owned two plasma centers in Florida, in addition to their Buffalo corporation. Lighte first met Diaz through the Florida plasma centers where he had served as a consultant for four or five years. Buffalo Plasma had run into difficulties in the early 1970s because blood from some of its donors contained alcohol, which caused a local Buffalo hospital to rescind its contract with Buffalo Plasma, thereby forcing it to close. Diaz then asked Lighte to help reopen Buffalo Plasma. Since Diaz and Lighte lived in the Miami area, a Dr. Lesassier ran the day-to-day operations in Buffalo.

During the succeeding months, Lighte travelled to Buffalo several times. As part of his plan to reorganize Buffalo Plasma, Lighte negotiated a contract with Jose Boullon, an employee of Highland Corporation (Highland). Under the arrangement worked out between Boullon and Lighte, Highland agreed to pay Buffalo Plasma $5 more per liter than the market price for the blood plasma it purchased. From this five dollar increase, Lighte agreed to give Boullon one dollar per liter as a "commission" and 50 cents per liter was to be used personally by Diaz. Diaz testified at trial that when he asked Lighte how Boullon would be paid, Lighte replied that "he would take care of it."

The flow and distribution of Buffalo Plasma's corporate income can be traced as follows: Buffalo Plasma maintained a checking account in the Merchants Bank of Miami, into which it deposited the money received from Highland. Diaz and Lighte monitored the number of liters that Highland purchased. Checks were then drawn from the Merchants Bank to the order of the Fred J. Lighte Trust Account #1 (Trust Account), which Lighte opened in 1978 at the Washington Savings and Loan Association in Florida. The checks drawn from the Merchants Bank checking account and deposited into the Trust Account consisted of the one dollar and fifty cents per liter to be paid to Boullon and Diaz. From the Trust Account, checks were periodically drawn by Lighte to Continental Biological, a corporation controlled by Boullon. These payments represented Boullon's one dollar "commission" on purchases Highland had made from Buffalo Plasma. Deposits were made into the account by Diaz; all withdrawals were made by Lighte. During the period from October 1978 to June 1982 there were 27 deposits made into the account and 26 withdrawals. The disbursements and deposits each totalled approximately $57,000. The bank required that all disbursements from such a savings trust account be made payable to the title of the account in the form of a check.

At trial, evidence showed that five checks were endorsed to Continental Biological (Boullon's corporation) for $5,869. Three checks were drawn to Fred J. Lighte and Associates or Fred J. Lighte and Peter R., appellant's son, totalling $3,635. Diaz received two checks totalling $5,929.75 that he used in part to buy a boat lift for his house. The rest of the withdrawals could not be identified. The only information on seven checks for $26,208 was that they were cashed at the Republic National Bank. Checks for the balance of approximately $15,000 were either missing or their endorsements were unclear.

Additional evidence demonstrated that Lighte was the Trust Account's sole signatory and that the address listed on the account card was to a post office box he had rented in Miami Beach. Before a withdrawal could be made Lighte had to sign a withdrawal slip, and after any transaction the passbook was mailed back to him. Each time a deposit was made, the passbook was similarly returned to appellant's post office box. Four original withdrawal slips and disbursement checks were admitted into evidence at trial. Lighte's signa-

ture was positively identified by the government's handwriting expert on three of the original withdrawal slips and the same expert believed it probable that it was Lighte's signature on the fourth. Appellant was the first endorser on three .disbursement checks that were made payable to accounts he controlled. The bank had no record of any beneficiary for this Trust Account, nor was one identified at trial.

### B. *Grand Jury Testimony*

With this evidence in mind, we consider the grand jury testimony. A search of the Center's financial records uncovered the four checks payable from the Fred J. Lighte Trust Account # 1 to accounts controlled by Lighte. The government then sought additional information concerning the purpose of these checks. Lighte, who was not one of the four individual targets of the grand jury's investigation, was subpoenaed to give this information. In September 1982 appellant appeared before the grand jury in the Western District of New York at Buffalo. He said he was a business consultant and admitted familiarity with Buffalo Plasma's operations.

He was then questioned about the four checks (on three of which he was the first endorser) made payable to the Trust Account that had been disbursed into accounts he controlled.[1] His responses to these questions formed the basis of the perjury indictment.

On this appeal Lighte challenges the sufficiency of the evidence to support a jury finding that he made a material false statement. He also claims that the statements

1. (1)Q. Check Number 293 in the amount of $2,650.00, written to you on Buffalo Plasma Center, what was that for, please?
\* A. This is not to me.
(2)Q. Well, it's written to Fred J. Lighte, Trust Account Number 1?
\* A. This is not to me. This is not to me at all.
(3)Q. Well, what is Fred J. Lighte Trust Account Number 1?
\* A. This apparently was an account that Peter Diaz had.
Q. There is some writing on the back of the check?
A. That's what it says.
Q. It says for deposit only for Fred J. Lighte account, with an account number and some initials?
A. That's right.
(4)Q. You don't know what that is, then?
\* A. No.
(5)Q. Check 413 is Fred J. Lighte, again, $1,750.00?
\* A. Nope. Same thing, I don't know what that's for.
(6)Q. Grand Jury Exhibit 102, Fred J. Lighte Trust Account Number 1, again?
\* A. No.
(7)Q. Check Number 638, which is Grand Jury Exhibit 103, Fred J. Lighte, Trust Account Number 1 again?
\* A. Nope.
Q. And Grand Jury Exhibit—Check Number 405, Grand Jury Exhibit—
A. Yes, this was remuneration for a trip I made to Washington.
Q. So this is one that you received the proceeds of?
A. That's my endorsement, yes.
(8)Q. And you did not receive the proceeds of the others?
\* A. No, these are not mine....

(9)Q. You mentioned, when you were looking through the trust account, you said that must be an account which Pedro Diaz had, and were looking at the account. Why would you say this was an account that Pedro Diaz had?
\* A. Because it's his account.
(10)Q. How do you know it's his account?
\* A. Because he told me.
(11)Q. What was the purpose of the account?
\* A. That's his business. I don't know.
(12)Q. Why would he tell you he was setting up one in your name?
\* A. I don't know. I really don't.
(13)Q. Did you ever draw any proceeds from that account?
\* A. Oh, no, never.
Q. Why did you allow him to do that?
A. I don't know, and I don't remember. But apparently it was a careless act on my part....
MS. FISHER: Does anyone have any questions for Mr. Lighte? Yes, sir?
A JUROR: These checks here, who filed—who used them for their income tax report? You?
THE WITNESS: I imagine the man who used the money....
(14) A JUROR: Am I to understand that you permitted Mr. Diaz to open an account with your name without asking why or what it's going to be used for?
\* THE WITNESS: Yes, as a trust account, yes.
(15) A JUROR: You didn't question it at all?
\* THE WITNESS: No.
A JUROR: Thank you.
THE WITNESS: This happens all the time in my business.

he made before the grand jury were literally true—even though unresponsive—answers to ambiguous questions. He asserts therefore that such responses as a matter of law may not serve as a basis for a perjury conviction.

## II DISCUSSION

### A. *Purpose of Perjury Statute*

Perjury statutes operate to prevent false testimony in judicial proceedings. As such, they represent a more enlightened approach to obtaining the truth than the penalties of death or the pillory imposed for perjury during the nascent stages of European jurisprudence. *See Bronston v. United States,* 409 U.S. 352, 360–61, 93 S.Ct. 595, 600–01, 34 L.Ed.2d 568 (1973). A statute prohibiting perjury, or in the instant case false declarations before a grand jury, is today aimed primarily at allowing the government to press an inquiry into wrongdoing free from the self-interest of those witnesses who hide the truth behind a curtain of vexing lies. *See United States v. Williams,* 341 U.S. 58, 68, 71 S.Ct. 595, 600, 95 L.Ed. 747 (1951); *United States v. Norris,* 300 U.S. 564, 574, 57 S.Ct. 535, 539, 81 L.Ed. 808 (1937). At the same time, we have adopted the common law rule of England that the punishment for perjury should not be so severe as to discourage witnesses from appearing and testifying. *Bronston,* 409 U.S. at 359–60, 93 S.Ct. at 600–01.

The applicable statute provides that whoever "knowingly makes any false material declaration" while testifying under oath before a federal grand jury "shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1623(a) (1982). In the discussion that follows we analyze the general rules that courts apply to the language of § 1623— treated the same as perjury under § 1621— and then consider the defenses to perjury advanced by appellant in this case.

Section 1623(a) prohibits a person from knowingly making a material false declaration when testifying under oath before a grand jury. Several of these elements are not disputed. Fred J. Lighte is accused of falsely testifying under oath before the federal grand jury for the Western District of New York. Further, appellant does not contest the materiality of his grand jury testimony. In any event, materiality is a question to be determined by a court as a matter of law, *United States v. Mancuso,* 485 F.2d 275, 280 (2d Cir.1973), and here Lighte's testimony before the grand jury plainly was material to the subject of the grand jury's investigation. Thus, only the falsity of appellant's statement is at issue.

### B. *General Rules in a Perjury Prosecution*

Perjury requires that a witness believe that the testimony he gives is false. Thus, whether the witness believes that an answer is true or false generally turns on the declarant's understanding of the question. A jury is best equipped to determine the meaning that a defendant assigns to a specific question. *See United States v. Bonacorsa,* 528 F.2d 1218, 1221 (2d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United States v. Sampol,* 636 F.2d 621, 655 (D.C.Cir.1980) (per curiam). "Absent fundamental ambiguity or impreciseness in the questioning, the meaning and truthfulness of [declarant's] answer [is] for the jury." 528 F.2d at 1221 (*citing United States v. Wolfson,* 437 F.2d 862, 878 (2d Cir.1970)).

How a defendant interprets a question obviously is not viewed subjectively, as that would compel the jury to accept as conclusive the meaning a defendant alleges he gave to the stated question, and no perjury prosecutions would ever result in convictions. *United States v. Lattimore,* 127 F.Supp. 405, 410 n. 21 (D.D.C.), *aff'd per curiam by an equally divided court,* 98 U.S.App.D.C. 77, 232 F.2d 334 (D.C.Cir.1955). The test is therefore an objective one. The jury should determine whether the question—as the declarant must have understood it, giving it a reasonable reading—was falsely answered. If the jury has been properly charged that it cannot convict the declarant if he made a

false statement by mistake or inadvertence, and that an answer is knowingly false "only if it was untrue when made and known to be untrue by the individual making it," then a reviewing court will not disturb the jury's determination. *United States v. Williams*, 552 F.2d 226, 229 (8th Cir.1977); *see United States v. Diogo*, 320 F.2d 898, 907 (2d Cir.1963).

▮ In determining the meaning a declarant gives to a question, a jury need not examine isolated segments of the question and answer exchange, but may view it within the context of the entire line of questioning. *See Bonacorsa*, 528 F.2d at 1221. The jury may also consider extrinsic evidence that demonstrates how a declarant interpreted a question. *See United States v. Marchisio*, 344 F.2d 653, 661 (2d Cir.1965); *United States v. Chapin,* 515 F.2d 1274, 1280–81 (D.C.Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). Although probing a declarant's intent poses difficulties, circumstantial evidence, including proof of a motive to falsify, often may serve to convince a reasonable juror beyond a reasonable doubt of a witness' criminal intent. *United States v. Natelli*, 527 F.2d 311, 318 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *see* 515 F.2d at 1280–81.

## III  DEFENSES TO PERJURY

We turn to appellant's defenses. The first is a *Bronston* defense—an assertion that the answer given was literally true, even though misleading by negative implication. Whether an answer is literally true raises a factual question to be resolved by a jury.

### A.  *Preserving a* Bronston *Defense for Review*

▮ Before discussing this defense, we first examine the government's claim that it was not preserved for appeal. When the trial court's attention is not directed to a claimed trial error so as to afford it a chance to make a timely correction, such error ordinarily will not be reviewed on appeal. *United States v. Mas-*

*cuch*, 111 F.2d 602, 603 (2d Cir.), *cert. denied*, 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed.2d 416 (1940). To challenge at trial the sufficiency of portions of a perjury indictment, a defendant should move to withdraw the challenged assignments from the indictment. *Id.; United States v. Goldstein*, 168 F.2d 666, 671 (2d Cir.1948). If that motion is not made, the issue may still be preserved for appeal if the appellant chooses an equivalent method that focuses the attention of the trial court on the alleged errors. *Bonacorsa*, 528 F.2d at 1222; *Natelli*, 527 F.2d at 329–30.

▮ Although appellant did not move to withdraw portions of the perjury indictment he did raise his *Bronston* claim before the trial court. During trial, Lighte's counsel moved for a special verdict and argued this issue. He identified errors in various questions and argued for the application of that defense. At this point the district court commented on the quality of the questioning—an issue before us on this appeal—but made no findings respecting the questions asked. Given the length of the discussion, the direct references to *Bronston*, and the trial court's subsequent charge on it, we believe the district court was properly apprised of appellant's claim that the questions asked of him were ambiguous and his responses literally true and therefore protected under *Bronston*. Hence, the issue was preserved for appeal.

### B.  *The* Bronston *Defense*

In *Bronston*, a creditor was attempting to ascertain whether Bronston, then in bankruptcy, maintained any Swiss bank accounts. After receiving a "no" answer to the question, Bronston was then asked, "Have you ever?" to which he replied, "The company had an account there for about six months, in Zurich." 409 U.S. at 354, 93 S.Ct. at 598. Later, it was proved that Bronston, prior to the questioning, had for five years held a personal bank account in Geneva. As a consequence, the Supreme Court overturned Bronston's perjury conviction holding that the perjury statute did

not reach his literally true but unresponsive answer, even though it was arguably misleading by negative implication.

█ A perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that a questioner places upon an answer. *See Id.* at 360, 93 S.Ct. at 600; *United States v. Corr*, 543 F.2d 1042, 1049 (2d Cir.1976). The Supreme Court instructs "that any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution." *Bronston*, 409 U.S. at 362, 93 S.Ct. at 601. "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360, 93 S.Ct. at 600. The defense applies solely to those cases where a defendant's testimony is literally truthful—even if unresponsive. *Id.; Corr*, 543 F.2d at 1048–49. When testimony is knowingly false, perjury has been committed.

Appellant contends that although his answers were unresponsive, many were truthful. Specifically, he asserts that confusion arose from the questioner's use of the pronoun "you" to refer to the appellant in some cases as acting in his personal capacity, and in others acting as trustee. Ordinarily, absent a finding of fundamental ambiguity, a reviewing court's role is quite limited. When a jury is properly charged on the *Bronston* defense, and it indicates which responses it considers false, an appellate court would be hard pressed to overturn the fact finders' determination especially since the evidence must be viewed in a light most favorable to the government. Here, in the absence of a special verdict, we do not know whether the jury considered all of the allegedly perjurious responses to be false, but there can be no doubt that several of appellant's answers were literally true under any conceivable interpretation of the questions.

█ In question (1), Lighte was asked what check No. 293 was for. His response was that "[t]his is not to me." During closing argument, the government conceded that this response was true, which eliminated its consideration by the jury. Second, in question (12), appellant was asked "[w]hy would he [Peter Diaz] tell you he was setting up [an account] in your name?" To which came the answer, "I don't know. I really don't." This question required that appellant speculate as to Diaz's motives. Lighte could truthfully respond that he did not know the reasoning underlying Diaz's behavior. Third, a juror in question (14) asked: "Am I to understand that you permitted Mr. Diaz to open an account with your name without asking why or what its going to be used for?" The appellant responded that that was how he had testified. Regardless of the veracity of the previous testimony, Lighte had previously testified that Diaz had opened the account without his knowledge. When a witness testifies that "A" is a fact, and then is asked if he has testified that "A" is a fact, and he says yes, such response is truthful, regardless of whether "A" is a fact. Fourth, the record indicates that Lighte set up the account without discussing the details of its formation with Diaz. Therefore, his answer to question (15) is also accurate. Because these answers are literally true, they obviously cannot support a perjury charge. Absent a special verdict, we cannot assume that the jury did not rely upon them in finding Lighte guilty. As a consequence, the jury verdict cannot stand.

There can also be no doubt that there was sufficient evidence to support a finding by the jury that some of appellant's responses were perjurious. Lighte swore that he did not know the purpose of the Trust Account, had never received proceeds from it, never questioned its function, and never received money from it in any capacity. Through the use of witnesses, expert witness testimony, and other extrinsic evidence, the government proved that: appellant suggested that the Trust Account be opened; played an integral role in its formation; received proceeds from the account both as a so-called trustee and as an individual; retained a significant measure

of—if not total—control over the Trust Account because he was in possession of the passbook; signed the withdrawal slips; and took an active part in the transactions conducted through the account. Therefore, the evidence was sufficient to support a finding that, at a minimum, questions (3), (9), (11), and (13) were answered falsely and could properly form the basis for a perjury conviction.

### C. Defense of Fundamentally Ambiguous Questions

Appellant's other defense raises a question of law. He claims that the questions posed by the examining attorney were fundamentally ambiguous and that their impreciseness caused him to interpret them in a different way than the questioner intended.

#### 1. Fundamentally Ambiguous Generally

When a line of questioning is so vague as to be "fundamentally ambiguous," the answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction. *Wolfson*, 437 F.2d at 878. Inasmuch as the issue then becomes one of legal sufficiency, a reviewing court may override a jury determination. *See Bonacorsa*, 528 F.2d at 1221. The phrase "fundamentally ambiguous" has itself proven to be fundamentally ambiguous. The genesis for this rule is found in *United States v. Lattimore*. In that case Owen Lattimore was asked if he was a "follower of the Communist line." His denial resulted in a perjury indictment, which he moved successfully to dismiss. *Lattimore*, 127 F.Supp. at 413. In *United States v. Diogo* we embraced the concept that a fundamentally ambiguous question is a defense to perjury, stating, "[i]n a prosecution for perjury or false representation, absent fundamental ambiguity of the kind found in Lattimore, the question of what a defendant meant when he made his representation will normally be for the jury." 320 F.2d at 907; *Wolfson*, 437 F.2d at 878; *Marchisio*, 344 F.2d at 662.

A question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intel-

lect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Lattimore*, 127 F.Supp. at 410. When ambiguity in questioning is raised, the "defense ... may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole." *Bonacorsa*, 528 F.2d at 1221. Moreover, the fact that some ambiguous questions were asked does not preclude a perjury conviction. "If the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations." *Williams*, 552 F.2d at 229; *see also Chapin*, 515 F.2d at 1280. Again, because the words used in the question have different meanings in different situations does not make them fundamentally ambiguous. *See Marchisio*, 344 F.2d at 661–62.

#### 2. Application of Fundamentally Ambiguous to the Facts

Two of the questions asked of Lighte were fundamentally ambiguous because of the imprecise use of the pronoun "you." Throughout the questioning the examiner failed to differentiate between Lighte's actions as trustee and those which he undertook in an individual capacity. Each question was addressed to the appellant as "you." None contained language such as "you in your personal capacity" which would particularize the inquiry and clearly inform the appellant as to what was being asked. Lighte interpreted each question as directed to him in an individual capacity. While some undoubtedly were, others were not.

Such impreciseness caused at least two of the questions to be fundamentally ambiguous. One of these was question (1), to which as noted the government conceded to the jury the response was true, hence it could not form the basis of Lighte's convic-

tion. The other was question (8). It was preceded by this sequence:

Q. And Grand Jury Exhibit—Check Number 405, Grand Jury Exhibit—

A. Yes, this was remuneration for a trip I made to Washington.

Q. So this is one that you received the proceeds of?

A. That's my endorsement, yes.

(8)Q. And you did not receive the proceeds of the others?

A. No, these are not mine.

The sequence preceding question (8) referred to the appellant as an individual. But question (8) uses "you" without indication that, unlike the prior two questions, the appellant was now being questioned in his role as trustee. Lighte contends that his negative response was designed to state that he had not personally received the proceeds of other checks. Although the record shows that Lighte received some money in a personal capacity, during oral argument the Assistant United States Attorney stated that question (8) was falsely answered because Lighte received proceeds in his capacity as trustee. Since the question does not tell Lighte that he should answer it based on his actions as trustee, the response cannot be perjurious under the theory advanced by the government. Rather, the ambiguous use of the pronoun "you" rose to the level of a fundamental ambiguity and thus should not have been submitted to the trial jury.

In view of the fact that this case is remanded, we comment on another series of questions that, while perhaps not fundamentally ambiguous, were at least most inartfully phrased. Questions (3) through (7) were posed as follows:

(3)Q. Well, what is Fred J. Lighte Trust Account Number 1?

A. This apparently was an account that Peter Diaz had.

Q. There is some writing on the back of the check?

A. That's what it says.

Q. It says for deposit only for Fred J. Lighte account, with an account number and some initials.

A. That's right.

(4)Q. You don't know what that is, then?

A. No.

(5)Q. Check 413 is Fred J. Lighte, again, $1,750.00?

A. Nope. Same thing, I don't know what that's for.

(6)Q. Grand Jury Exhibit 102, Fred J. Lighte Trust Account Number 1, again?

A. No.

(7)Q. Check Number 638, which is Grand Jury Exhibit 103, Fred J. Lighte, Trust Account Number 1 again?

A. Nope.

It is puzzling as to what "that" in question 4 refers. The government argues that it refers to the account, but that interpretation seems doubtful. The question starts with the phrase "[y]ou don't know". If it did refer to the account, Lighte had already stated that the account belonged to Diaz. Further, questions (5), (6), and (7) are completely amorphous. For example, the use of "again" in question (5) might refer back to question (4) and its use in questions (6) and (7) might refer back to question (5). Regardless, even if there is some benchmark for determining the meaning of the phrase, the same word was used for different thoughts in a sequence of questions which gave no indication as to the phrase's meaning, let alone the possibility of differing meanings. If the questioner had intended to probe as to the purpose behind each check's issuance, or had wanted to examine the workings of the account, more focused questions should have been asked.

## IV CONCLUSION

The answers to the fundamentally ambiguous questions should not have been submitted to the jury, nor can those that were literally true form the basis of the perjury conviction. Yet, there was suffi-

cient evidence for the jury to conclude that some of appellant's responses were perjurious. When as here, the matter is properly preserved for appeal, we must vacate the conviction and remand for a retrial, *see Natelli*, 527 F.2d at 330. Here the only charge against Lighte is perjury and his conviction could have been based on answers that should not have been considered by the jury or on others that he truthfully answered. Therefore, the judgment of conviction is reversed and the case is remanded to the district court for a new trial. At retrial, the jury should be instructed that only the questions presently numbered 2, 3, 9, 10, 11, 13, and 15 may serve as possible predicates for a verdict of guilty. While questions 4 through 7 may be included, it would appear that in the exercise of his discretion the prosecutor should withdraw reliance on those questions.