**UNITED STATES of America, Appellee,**

v.

**Nicholas A. ATTICK, Defendant, Appellant.**

**No. 80–1726.**

United States Court of Appeals, First Circuit.

Argued April 6, 1981.

Decided May 22, 1981.

Rehearing Denied June 17, 1981.

Marshall D. Stein, Boston, Mass., with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., was on brief, for appellant.

James E. O'Neil, Asst. U. S. Atty., Boston, Mass., with whom Paul F. Murray, U. S. Atty., Providence, R. I., and Calvin B. Kurimai, Sp. Atty., U. S. Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Appellant Nicholas A. Attick was convicted of submitting false statements to the Rhode Island Hospital Trust National Bank, a federally insured bank, for the purpose of influencing the bank to loan his company money in violation of Title 18, U.S.Code, §§ 1014 and 2(b).[1] Attick was sentenced to a total of four years imprisonment and fined a total of $25,000.

Attick was president and owner, through a holding company, of J. Daren and Sons Incorporated, a food service company. On March 23, 1979, J. Daren entered into a Revolving Credit Loan Agreement (the "agreement") with a bank in Connecticut. It was assigned to the Hospital Trust Bank. The agreement provided that the borrower, J. Daren, would request funds, up to $2.5 million, from the Hospital Trust Bank, by means of a form called a "Request for Advance".

An officer of J. Daren was required to sign a Request for Advance form prior to each advance of credit. It states that J. Daren "represents and warrants that no event has occurred and is continuing, or would result from the proposed Advance, which constitutes an 'Event of Default', as that term is defined in the Agreement . . . ."

J. Daren agreed in the standard language contained in the agreement, that it would not directly or indirectly distribute cash "to holders of shares of its capital stock" unless the Hospital Trust Bank consented in writing. Violation of that covenant constituted an "Event of Default".

On April 10, May 16, May 24, June 12, June 21 and July 9, 1979, Requests for Advances of more than $750,000 were made to the Hospital Trust Bank on forms setting forth the above representation and warranty, as provided in the agreement. It is undisputed on this appeal that during the same period Attick caused approximately $350,000 of J. Daren cash to be distributed for his own personal use. At the time of sentencing, J. Daren was in Chapter XI proceedings.

The government charged that defendant obtained money from the bank in part by making a false statement, namely, the statement made at the time he requested advances from the bank that "no event has occurred . . . which constitutes an 'Event of Default' as that term is defined in the Agreement . . . ." This statement, in the government's view, was false because Attick knew that an Event of Default had occurred, namely the event consisting of J. Daren's distribution to Attick of cash from the corporation.

Appellant was convicted. His claim on this appeal is one of "truth". He correctly points out that one cannot be convicted under 18 U.S.C. § 1014 if the statement claimed to be false is, in fact, literally true. *See United States v. Diogo*, 320 F.2d 898 (2d Cir. 1963) (construing similar language in 18 U.S.C. § 1001). He adds that his statement to the bank was literally true because no Event of Default had occurred. In his view, J. Daren's payment of the loan's proceeds to him did not violate the agreement because the agreement's prohibition of distributions of cash "to holders of shares" of J. Daren was not violated. Appellant argues that he was not a "holder of shares" of J. Daren because, in fact, all J. Daren shares were owned by Olympac Company—a holding company of which appellant is admittedly the sole shareholder. In his view, the fact that he owns J. Daren shares through Olympac means that the agreement, technically speaking, was not breached, and therefore he did not lie when he told the bank the agreement had not been breached.

---

1. Title 18, U.S.C., § 1014 states in part: "Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the acts of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation . . . upon any application, advance . . . or loan, . . . shall be fined not more than $5,000 or imprisoned for not more than 2 years or both."

   Title 18, U.S.C. § 2(b) states: "Whoever wilfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

■ We believe, however, that there was evidence in the record from which the jury could conclude beyond reasonable doubt that the agreement was breached and that the defendant knew it. The agreement specifies that it is to be interpreted in accordance with Rhode Island law. Under Rhode Island law governing the interpretation of contracts, as under the common law, the meaning of the terms in an agreement depends upon the understanding of the parties, determined from the words of the contract and the circumstances surrounding the choice of those words, including representations made in the course of the negotiations. *See Hill v. M. S. Alper & Son, Inc.,* 106 R.I. 38, 47, 256 A.2d 10, 15 (1969). *See also Westinghouse Broadcasting v. Dial Media,* 410 A.2d 986, 992 (R.I.1980). Peter Paquin, Vice President of Hospital Trust Bank, testified that, during the negotiations for the loan, Attick outlined the nature of J. Daren's business and told Paquin that he was its "president and sole stockholder". He testified:

(Direct Examination)

Q. And did you become aware of his position with the food brokerage business, sir?

A. Yes, he was president and sole stockholder of the J. Daren and Son." (Transcript at 7)

(Cross Examination)

Q. When did you learn, Mr. Paquin, that Mr. Attick is the sole stockholder of J. Daren and Company?

A. We became fully aware of that—we were told that initially going into the thing that he was the sole stockholder.

Q. Did you check that out?

A. No, we took his word for it. (Transcript at 80–81)

Moreover, in a report, which Attick submitted to the Hospital Trust Bank when applying for the revolving credit arrangement, he described his relation to J. Daren as follows:

Mr. N. A. Attick acquired by purchase, through a wholly-owned holding company, all of the common stock of J. Daren and Sons Company . . . .

Further, it is clear that the purpose of the agreement provision at issue was to prevent those who controlled J. Daren from milking it of cash thereby placing the bank loan in jeopardy. Finally, it was undisputed (and the jury was told that to convict it must find) that Attick was the beneficial holder of J. Daren's shares. Under the circumstances, it is clear that the agreement was intended to, and literally did, include the relation that Attick held to J. Daren. The agreement was thus breached as a matter of Rhode Island contract law when Attick took $350,000 from the corporation for his own use; and Attick made a false statement when he caused false Requests for Advances to be submitted stating that it was not.

■ Attick argues that the words "holder of shares" in the agreement must be interpreted strictly and identically with the Rhode Island Business Corporation Act definition of "shareholder", namely, "one who is a holder *of record* of shares in a corporation". General Laws of Rhode Island § 7–1.1–2(b). (Emphasis added.) Olympac, not Attick, he adds, was the "holder of record". We reject this argument because we believe that Rhode Island contract law, not corporation law, governs the meaning of the words in the agreement. But, even if the Corporation Act applies, we note that in "cases involving the relationship between shareholders and corporation . . . the corporate entity is disregarded and will be considered as though an association of persons if it is used to defeat public convenience, justify wrong, protect fraud, or defend crime or work an injustice." *Vennerbeck & Clase Co. v. Juergens Jewelry Co.,* 53 R.I. 135, 139, 164 A. 509, 510–511 (1933). *See United Transit Co. v. Nunes,* 99 R.I. 501, 209 A.2d 515 (1965). Thus, we believe that the Rhode Island courts in this instance would, as a matter of law, have pierced Olympac's corporate veil to find Attick the holder of J. Daren's shares.

■ Defendant also argues that, even if the transfers of cash violated the agreement, the government failed to show that he knew that they did. More particularly,

he claims that he *may* have *thought* that under Rhode Island law he was home free because he was not, as a technical matter, a *record* holder of shares. It was up to the government, he adds, to show that he did not think this; he claims that the government must show that he did not—*for this reason*—lack the requisite guilty knowledge.

This argument fails for two reasons. First, there is more than enough evidence in the record for the jury to conclude that Attick knew the transfers breached the agreement. Pacquin's testimony about what Attick said, representations in writing to the bank, the agreement's obvious purpose (preventing the corporation's owners from taking cash out) all warrant a finding that Attick knew that he had promised the bank not to take cash out of the corporation. Second, the government was not required to request individual instructions which specifically negative each and every *conceivable* set of facts that might mean Attick lacked the requisite knowledge. If Attick wished to claim the existence of an unusual set of facts that, in the circumstances, rebuts an inference of knowledge that would otherwise be drawn, he was obliged to argue such a theory or at least to request an appropriate instruction. *See McMurray v. United States*, 298 F.2d 619 (10 Cir. 1961), *cert. denied*, 369 U.S. 860, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962); *United States v. Hamilton*, 420 F.2d 1096 (7th Cir. 1970). He did not do so here. Rather, he simply rested on the claim that he did not know what was in the agreement—a claim that the jury rejected.

In fact, the district court instructed the jury that to convict it must find beyond a reasonable doubt that Attick "was an owner of stock of J. Daren Corporation" and that it "may find ... the defendant was the beneficial owner" of the J. Daren stock if he was "the sole stockholder of the Olympac Corporation". These instructions, though not totally clear on the issue of contract interpretation, were adequate—particularly because there was no relevant disputed issue of fact. Defendant's objection to these instructions rested entirely upon his theory that, as a matter of law, he could not be convicted because he held J. Daren's shares through Olympac, rather than holding them directly. That theory was erroneous.

The judgment of the district court is therefore

*Affirmed.*