**UNITED STATES of America,**

v.

**Laurene WATTS, Lenore L. Ilaria, and Vincent Magnone, Defendants.**

**No. CR 98–1123(ARR).**

United States District Court,
E.D. New York.

Sept. 3, 1999.

Charles F. Carnesi, Carnesi & Associates, Uniondale, NY, Gerald L. Shargel, New York City, Law Offices of Maurice H. Sercarz, New York City, James LaRossa, LaRossa Mitchell & Ross, New York City, for dfendants.

Jo Anne Weissbart, Assistant U.S. Attorney, U.S. Attorney's Office, Brooklyn, NY, for U.S.

## MEMORANDUM AND ORDER

ROSS, District Judge.

On June 9, 1999, a jury in this court returned a verdict convicting each defendant—Laurene Watts ("Watts"), Watts's mother, Lenore Ilaria ("Ilaria"), and their attorney, Vincent Magnone ("Magnone")—of one count of making a false statement to a bank, in violation of 18 U.S.C. § 1014, and conspiracy to commit that offense, in violation of 18 U.S.C. § 371. The jury also convicted defendant Magnone on charges of money laundering and money laundering conspiracy, in violation of 18 U.S.C. §§ 1956 and 1957. Defendants now move under Rule 29(a), Fed.R.Crim.Pro., for acquittal on all counts or, alternatively, pursuant to Rule 33, Fed.R.Crim.P., for a new trial in the interests of justice. For the reasons explained below, I find that the government's § 1014 charge alleges as false a "fundamentally ambiguous" statement that should not have been presented to the jury. Alternatively, I find that the government has failed to meet its burden of presenting evidence sufficient to establish beyond a reasonable doubt the falsity of the statement defendants made to the bank. I therefore grant all defendants' Rule 29 motions with respect to the count charging a violation of 18 U.S.C. § 1014. Further, because under the circumstances of this case conviction of the § 1014 count is a necessary predicate for conviction of the other crimes charged, I also grant defendants' Rule 29 motions on the remaining counts, without addressing their other arguments for the relief sought.

## THE EVIDENCE

Viewing the evidence in the light most favorable to the government, and resolving all credibility issues and drawing all reasonable inferences in the government's favor, the evidence at trial established the following facts bearing on the falsity of the statement defendants made to the bank:

By a handwritten Uniform Residential Loan Application dated October 31, 1994, defendants Watts and Ilaria applied to the Greenpoint Savings Bank for a $210,000 loan on a home they owned at 30 Delphine

Terrace, Staten Island, New York. By checking labeled boxes on the form, they identified the purpose of the loan as a "refinance" of their "primary residence;" and in response to a directive that they "complete this line if this is a refinance loan," they wrote that they had purchased the home in 1986 for $290,000, and that no liens were outstanding on the property. Replying to a question posed by the form as to the "purpose of refinance," they wrote "improvements," and asked to describe the improvements and specify their cost, they inserted "$200,000+ renovations, additions." The section of the form calling for information regarding the improvements bears two small boxes directly to the right of the instruction, "describe improvements." One box is labeled "made," and the other is labeled "to be made." Defendants placed a checkmark in both boxes. Thus, in applying to the Greenpoint Savings Bank for a $210,000 residential loan, defendants Watts and Ilaria represented that the purpose of the loan was "$200,000+" in "renovations and additions" both "made" and "to be made" to the home. Defendant Magnone, acting as their attorney, submitted the application to the bank.

The government also established what was referred to at trial as the "money trail," evidence demonstrating that the proceeds of the loan were ultimately devoted, not to improvements to the residence, but to an investment in a telephone debit card business. Specifically, the government proved that at the closing of the loan on February 17, 1995, some three and a half months after the application was made, the bank issued to defendant "Vincent Magnone, As Attorney," a check for the net proceeds of the loan, totaling $195,-004.06. Approximately five days later, Magnone deposited the check into his "special account" at Pioneer Savings Bank, where the funds remained for approximately six weeks. Then, on April 7, 1995, Magnone drew two checks on this account, each in the amount of $95,000—one payable to Joseph Rosillo and the other payable to Wael Al Khatib. Each bore in the "memo" portion of the check the handwritten notation, "Re: CNC." The government established that CNC was an abbreviation for CONETCO, a telephone debit card business in which Rosillo and Al Khatib were principals.

The government also introduced evidence supporting the inferences that defendant Laurene Watts's then-husband, Joseph Watts, was employed by CNC in 1995, earning more than $150,000 in that year; that defendant Magnone, in June and July of 1995, was issued CNC stock certificates, as nominee, for shares of stock previously held by Rosillo and Al Khatib; and that, between April of 1994 and May of 1995, Joseph Watts's sister transferred a total of $220,000 to Rosillo and Khatib.

In addition to its proof of the "money trail," the government introduced evidence concerning the nature and extent of the improvements made to the Watts and Ilaria home. Through the testimony of James Denzler, the architect who designed a renovation to the home in 1986, and that of John Glazar, the Greenpoint appraiser who appraised the home in November of 1994, together with various exhibits (including a building department application, Denzler's drawings, and Glazar's appraisal report) the government adduced proof that extensive renovations had been made to the home before the loan closed. This evidence established that, when purchased, the home was a single story, ranch style house with 1,264 square feet of living space and an unfinished basement. By November of 1994, it was a two-story structure having more than 5,000 square feet of living space, including a finished basement. The pre-closing improvements also included a deck and various internal appointments, such as a wine cellar, a fireplace, a wet bar, and central air conditioning. Applying Glazer's 1994 building cost estimate of $70 per square foot to the home as it existed eight years earlier, the government's evidence established that the cost

of improvements made prior to the November, 1994 appraisal roughly approximated $200,000 [1].

The government also adduced evidence aimed at controverting any claim that improvements were made to the home after the loan closed. This evidence consisted of: (1) a comparison of photographs taken by Mr. Glazar in 1994 with photographs taken immediately prior to trial, suggesting that the exterior appearance of the home was similar before and after the loan; (2) the testimony of Adib Ghattas, a plan examiner for the New York City Department of Buildings, that a permit is required to perform renovations that affect a building's structural stability or the health or safety of its occupants—for example, installation of plumbing or electric lines, although no permit is necessary for non-structural renovations such as painting or repair or replacement of a non-structural element; and (3) the testimony of a Department of Buildings document custodian that there is no record of a permit having been issued for renovations at defendants' home at any time after the loan closed.

Finally, the government elicited testimony from Mr. Glazar, the Greenpoint real estate appraiser, that when he visited the home in 1994 to conduct his appraisal, he asked the occupants how they intended to use the loan proceeds. Defendant Ilaria and/or defendant Watts replied that the planned use of the money was for an investment in other property.

## DISCUSSION

■ In a false statement prosecution under § 1014, the government must prove beyond a reasonable doubt, as an essential element of the offense, that the statement at issue was false and that defendant knew the statement to be false at the time it was made. Where the statement may fairly be characterized as "ambiguous," difficult issues arise concerning whether the government has met its burden of proving the element of falsity. If a statement is so vague as to be "fundamentally ambiguous," it should not be the subject of a charge under § 1014 at all. Even absent "fundamental ambiguity," however, the government must shoulder the burden of proving the falsity of the statement beyond a reasonable doubt. In this case, as addressed in detail below, the record demonstrates that defendants' § 1014 convictions fail as a matter of law on both grounds. The statement that was the subject of the § 1014 charge was "fundamentally ambiguous." Alternatively, even if the statement is assumed to be unambiguous, the evidence did not suffice to sustain the government's burden of proving that the statement was false.

### I. Fundamental Ambiguity of the Statement

■ Where a question is so excessively vague as to fall within a category identified as "fundamentally ambiguous," the answer may not, as matter of law, form the basis of a prosecution for perjury or false statement. *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir.1987) (citing *United States v. Lighte*, 782 F.2d 367, 375 (2nd Cir.1986)), *abrogated on other grounds*, *United States v. Wells*, 519 U.S. 482, 486 n. 3, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). As explained by the Second Circuit in *Lighte*, "the genesis for this rule is found in *United States v. Lattimore*." 782 F.2d at 375. In *Lattimore*, 127 F.Supp. 405 (D.D.C.), *aff'd per curiam by an equally divided court*, 232 F.2d 334 (D.C.Cir.1955), the court dismissed a perjury indictment as unconstitutionally vague, finding the in-

---

1. In his November, 1994 appraisal, Gov't.Ex. 62, Glazar estimated the total cost of improvements to the property at $313,000. Subtracting from that amount $88,480 (Glazar's $70 per square foot estimate of the cost of improvements in 1994 multiplied by 1,264 square feet, the living space at the time the home was purchased in 1986), the estimates in Glazar's appraisal indicate that between 1986 and 1994, improvements costing in excess of $225,000 were made to the home.

**110**

quiry whether defendant was a "follower of the Communist line" so "subject to varying interpretations" that only "by groundless surmise . . . could the jury determine which definitions defendant had in mind." 127 F.Supp. at 408, 409. The Third Circuit has expressed the purpose animating the doctrine of fundamental ambiguity as "two-fold." It is intended both "1) to preclude convictions that are grounded on little more than surmise or conjecture, and 2) to prevent witnesses (or loan applicants) from unfairly bearing the risks associated with the inadequacies of their examiners, and thereby to encourage participation in the judicial (or banking) system." *Ryan*, 828 F.2d at 1015.

In *Lighte*, the Second Circuit looked to *Lattimore* in defining the point at which a question becomes so ambiguous that it is not amenable to jury interpretation. A question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mental understanding by a questioner and answerer unless it were defined at the time it was sought and offered as testimony" *Lighte*, 782 F.2d at 375 (quoting *Lattimore*, 127 F.Supp. at 410). The *Lighte* court also emphasized the significance of considering the question or statement not in isolation but in context. In particular, the court admonished against extracting a statement from its context, "giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole," as it is the context that fixes the meaning of the question posed or statement made. *Lighte*, 782 F.2d at 375 (quoting *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976)).

█ Both at trial and on this motion, the specific statement identified by the government as false is that portion of the residential loan application in which the defendant borrowers represented that they intended to make further improve-

ments to the residence *after* the loan closed. Under the government's theory, in the precise words of the application, the defendant borrowers knowingly made a false statement to the bank when they checked the "to be made" box as well as the "made" box when representing that the purpose of the "refinance" loan was "renovations and improvements" to the residence totaling "$200,000 + ."

Significantly, the government does not contend in this prosecution that the check in the "made" box constituted a false statement, nor does it contend that "$200,000 + " in "renovations and improvements" were *not* made to the house *before* the loan closed. Indeed, the government acknowledges that it adduced proof in its own case that "extensive" renovations were made to the home prior to the closing. *See* Government's Memo. in Opp. at 12–13. Thus, the precise false statement forming the basis of this § 1014 prosecution is the representation that the borrowers intended to make, after closing, unspecified improvements to the residence at an unspecified cost.

Because the government's theory, when examined in the context of the facts proven in this record, so narrowly yet so imprecisely circumscribes the statement alleged to be false, it is difficult to avoid the conclusion that the statement is too nebulous to escape categorization as a "fundamentally ambiguous" one. A representation of intent to make future improvements costing an unspecified amount, especially when coupled with a contemporaneous representation that improvements had already been made, and in the context of evidence establishing that improvements had in fact been made in an amount roughly approximating the total amount represented, provides no useful basis for determining what was meant by the statement charged as false. It could mean that a significant portion of the loan proceeds was to be used for further improvements. On the other hand, it could as easily mean that the borrowers intended to use all or part of the proceeds to replace funds already ex-

pended for improvements, but that they wished to reserve the right to use some of the proceeds for further improvements should the need arise. So amorphous a representation simply cannot readily be imbued with a "meaning about which men of ordinary intellect could agree," *Lighte,* 782 F.2d at 375 (quoting *Lattimore,* 127 F.Supp. at 410). Accordingly, it should not have been presented to the jury.[2]

## II. Insufficiency of the Evidence to Prove Falsity

Assuming that the statement that is the subject of the § 1014 count does not fail as a "fundamentally ambiguous" one, there is arguably one construction of the statement susceptible of agreement among reasonable jurors—that is, that the defendants represented in the loan application that they would make *some,* even if only a nominal, expenditure on future improvements, when they in fact did not intend to make any such future expenditure. Indeed, in contending that "the questions as to the purpose on the loan application were not ambiguous," the government appears to embrace this interpretation. *See* Government's Memo. in Opp. at 37. Even if a representation of intent to make some future expenditure, no matter how small or nominal, is unambiguous, however, the evidence in this case does not permit a finding that the government proved beyond a reasonable doubt that the statement, when construed in this way, was knowingly false.

### A. Evidence of Falsity

■ As detailed earlier, the government presented strong evidence that none of the identifiable proceeds of the loan were used for home improvements, but were rather invested in a telephone debit card business with which defendant Laurene Watts's then-husband was associated. This "money trail" proof also constituted circumstantial evidence on the question of what defendants intended at the time they secured the loan. That they ultimately spent all of the money on a business investment is probative of the truth of their earlier representation that the purpose of the loan was for home improvements. If defendants had checked on the application form only the "to be made" box in identifying home improvements as the purpose of the loan, or if in the alternative the evidence showed that no substantial improvements were made to the residence before or after the loan, the money trail evidence alone might well have sufficed to establish beyond a reasonable doubt, albeit circumstantially, that the defendants' statement of intent to use the money for home improvements was false. But that is not what the evidence proved in this case.

Here, it is undisputed that defendants checked the "made" and "to be made" boxes on the application in identifying the home improvements that were represented to be the purpose of the loan. It is also uncontested that defendants had in fact made home improvements to the residence at a cost roughly approximating the $200,-000 figure represented. In light of this uncontroverted evidence, any inference of the falsity of the statement of intent to be derived from the evidence of a "money

---

**2.** As addressed below (at 16–21), the government contends that the statement of intent to make future improvements, even if literally accurate, is nonetheless actionable under § 1014 because it was intentionally misleading. In this context, the government seems to suggest that reasonable jurors could have interpreted the representation to mean that the borrowers intended to invest in improvements to the home after the loan closed in any sum exceeding a "nominal amount." *See* Government's Memo. in Opp. at 26. Ironically, this interpretation seems subject to the same infir-

mity that infects the statement it is intended to construe. Even assuming that a literally accurate statement could be found criminally false if it was made with an intention to mislead, in the context of the evidence in this case there is serious doubt whether reasonable jurors could be expected to agree upon what is meant by a "nominal amount." In the absence of such agreement, they could not properly conclude that defendants did not intend to expend on their home something in excess of that amount at the time they made the representation to the bank.

trail" is so weak as to be unreasonable. Put another way, if as the government assumes defendants represented in the loan application only an intent to make *any* improvement, however nominal, evidence that the actual proceeds of the loan were in fact devoted to a business investment can not support an inference beyond a reasonable doubt that defendants' representation was false.

That the money trail evidence is incapable of supporting an inference of a false statement of intent is even more apparent when one recalls that, as defendants have repeatedly urged, money is fungible. Because money is fungible, defendants' promise on the loan application to make improvements to their property was manifestly *not* a promise to use the very same dollars loaned by the bank to pay for the intended improvements. Thus, that the loan proceeds were used for other purposes lacks probative value on the question of whether the borrowers, at the time they signed the loan application, intended to make any expenditures on the home in the future, however small.[3] In sum, under the particular circumstances presented in this case, the "money trail" evidence can not support an inference beyond a reasonable doubt that defendants' earlier statement of intent was false.

This is so even when the "money trail" evidence is viewed in conjunction with the government's additional proof. As noted, the government proved, by comparing photographs of the home, that the exterior of the residence as it appears now is similar to the exterior as it appeared before the loan was extended. It also established that after the loan was extended, there were no applications for building permits necessary to make renovations that were structural in nature or affected the health and safety of the occupants. In view of the exceedingly narrow scope of the representation now at issue—at most, that defendants intended to make some unspecified, nominal improvement—proof tending to establish that there were no alterations to the exterior of the home and none requiring a building permit cannot, even in combination with the proof of a "money trail," establish beyond a reasonable doubt that no expenditure at all was made, much less that defendants intended that representation to be false when they made it.

The government's last piece of evidence—that Ilaria and/or Watts told John Glazier, the bank's appraiser, at the time he appraised their home in connection with the loan application, that the purpose of the loan was to buy other property—does little to strengthen the government's case. While this statement is certainly inconsis-

---

**3.** Although the government does not now directly dispute the truism that money is fungible, it nonetheless advances arguments that are at odds with it. For example, the government faults defendants' failure to "adduce evidence to show that any dollars that *could be attributed to the loan proceeds* ever reached Watts or Ilaria." Government's Memo. in Opp. at 33–34 (emphasis added). Similarly, the government argues that the jury was justified in concluding that defendants "never intended to make improvements *with the proceeds or with any other money with which the proceeds could be said to be fungible.*" *Id.* at 34 (emphasis added). Passing, for the moment, the government's assumption regarding who bore the burden of proof, it is evident that these arguments are based on the premise that defendants somehow promised to make home improvements either with dollars "traceable to" the very dollars that constitut-

ed the loan proceeds, or with other specifically identified dollars "with which the proceeds could be said to be fungible." But that was not what the defendants promised or stated as their intent. The government is correct that the commitment of the specific loan proceeds to uses other than those represented as the purpose of the loan is circumstantial evidence of what defendants intended at the time they made the representation. But the fact that the "money trail" may be circumstantially probative of intent does not mean that a statement of intent in a loan application to make expenditures in a particular way is tantamount to a representation that the promised expenditure will be made with dollars "traceable to" the loan proceeds. Nor is there any rational basis upon which to draw such an inference. Rather, the government's arguments simply resurrect the faulty assumption on which it purports not to rely.

tent with the borrowers' statement on the application that they sought the loan in connection with improvements to the residence, it is unlikely that the borrowers, had they knowingly and intentionally (as distinguished from negligently or mistakenly) misrepresented the purpose of the loan on the application, would have given the bank's own appraiser a flatly inconsistent explanation.

Finally, that the statement at issue is not one of historical fact but one of intent to perform in the future lends further support to the conclusion that the government's evidence is not nearly substantial enough to establish beyond a reasonable doubt that the statement was false. There is authority that statements of promise or intent, insofar as they constitute a representation of present intent, may form the basis of a false statement prosecution. *United States v. Shah,* 44 F.3d 285, 293–94 (5th Cir.1995); *but see United States v. Rothhammer,* 64 F.3d 554, 557–58 (10th Cir.1995) (promise to pay in a promissory note "did not amount to a factual assertion and thus cannot be construed as a false statement."). But as the *Shah* court cautioned: "The mere fact of subsequent nonperformance is not alone sufficient for a conviction." 44 F.3d at 294–95. Rather, it is only "where the non-performance is coupled with other probative factors, such as 'where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances,' [that] an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred." *Id.* at 293 n. 14 (quoting 37 *Am. Jur.2d.,* Fraud and Deceit § 478 (footnotes omitted)). Here, the government's evidence failed even to support an inference that no nominal improvements were made to the residence after the loan was extended. Hence, the government's evidence did not suffice to establish non-performance of the promise, much less to meet this special, if not heightened, burden necessary to prove the falsity of a statement of intent.

**B. *Burden of Proof On the Issue of Falsity***

Perhaps because of the paucity of proof in this record on the issue of falsity, portions of the government's response seem to imply the propriety of a shift of the burden of proof. For example, on this motion, as it did at trial, the government points to the absence of evidence adduced by the defense that Watts or Ilaria paid for any improvements to the home after the loan was extended. *See* Government's Memo. in Opp. at 16 ("Defendants introduced no evidence that either Watts or Ilaria ever paid for any improvements ..."). Similarly, the government engages in an extended analysis aimed at discrediting any inference from the appraisal report of Joseph Birrell, introduced by defendants at trial, that improvements were made to the residence after the loan was extended, including the addition of certain marble and slate materials and the renovation of an area of the basement. *See* Government's Memo. in Opp. at 18–23. While the government is clearly correct that the jury was entitled to reject this evidence, it was not defendant's burden to prove that improvements were made. Rather, it was the government's burden to prove that the defendants, when they completed the loan application in 1994, knew that they had no intent to make further improvements. If, as it did, the government sought to prove the falsity of that statement of intent in part by adducing proof that no improvements were made, it was the government that bore the burden of proof on the point.

Indeed, any suggestion that it was incumbent upon defendants to prove the truth of their stated intent by demonstrating that they subsequently made expenditures on the home is foreclosed by longstanding authority in this circuit. Because "[a] jury is best equipped to determine the meaning that a defendant assigns to a specific question ... 'absent fundamental ambiguity or impreciseness in the questioning, the meaning and truthfulness of

[declarant's] answer [is] for the jury.'" *Lighte,* 782 F.2d at 372 (quoting *Bonacorsa,* 528 F.2d at 1221). "The test is . . . an objective one. The jury should determine whether the question—as the declarant must have understood it, giving it a reasonable reading—was falsely answered." *Id.* Where there is any ambiguity in the statement, however, but no evidence is adduced on the question of what the defendant meant, "it is incumbent upon the government to negative any reasonable interpretation that would make the defendant's statement factually accurate." *United States v. Diogo,* 320 F.2d 898, 907 (2d Cir.1963).

*Diogo* involved a prosecution under 18 U.S.C. § 1001 (false statements generally) and 18 U.S.C. § 1546 (false statement in an application for a visa). At issue was the sufficiency of the evidence to prove that defendants' representations regarding the validity of their marriages were false when made to the Immigration and Naturalization Service. Finding defendants' representations ambiguous (because they failed to specify the jurisdictions to which the legal conclusions regarding marital status referred), and observing that the representations were in fact true under the law of New York, the court concluded that the government had failed to sustain its burden of proof on the issue of falsity, writing:

> In a prosecution for perjury or false representation, absent fundamental ambiguity of the kind found in *Lattimore,* the question of what a defendant meant when he made his representation will normally be for the jury. . . . Where, as here, however, no evidence is presented on the question, it is incumbent upon the Government to negative any reasonable interpretation that would make the defendant's statement factually correct.

*Id.* (citation omitted). Thus, where a question is in some way ambiguous although not "fundamentally" so, it is the government's burden to adduce evidence sufficient to establish falsity beyond a reasonable doubt in one of two ways. Either the government must prove beyond a reasonable doubt what it was the defendant meant when making the representation charged as false, thereby eliminating any ambiguity, and must prove that interpretation to be false. Alternatively, the government must prove beyond a reasonable doubt the falsity of any reasonable interpretation that, as described by the *Diogo* court, "would make the defendant's statement factually correct." *Id.*

In the instant case, contrary to the government's argument, *see* Government's Memo. in Opp. at 36, there is no proof of what the defendants meant when they checked the "to be made" box on the loan application. Neither the evidence of the "money trail" nor the proof of the seeming absence of external improvements or internal improvements requiring a building permit addresses that particular question. In these circumstances, *Diogo* directs that the government sustain the burden of disproving "any reasonable interpretation that would make the defendant's statement factually correct." *Id.* Here, at least one, if not the *only* reasonable interpretation of defendants' statement, (and one acknowledged by the government), is that defendants represented to the bank that they would make some unspecified, nominal improvement to the house after the loan closed. Under *Diogo,* the burden was squarely on the government to prove that *no* such nominal expenditure was made or intended. Manifestly, that burden was not met.

There is an additional argument advanced by the government that appears calculated to shift the burden of proof. The government maintains that even if defendants' representation of intent were "literally true," it nonetheless violated § 1014 because it was intentionally misleading. *See* Government's Memo. in Opp. at 26–30. The argument is tantamount to a claim that despite the government's failure to prove the falsity of defendants' statement of intent to make some nominal

improvement, their § 1014 convictions should stand because this "literally true" statement was intended to mislead. The argument is flawed both factually and legally.

At the outset, even assuming the legal claim to be of merit, it is of no avail to the government under the facts of this case. This is so because, for the reasons already addressed, the government did not prove beyond a reasonable doubt that defendants' statement of intent was "intentionally misleading" any more than it succeeded in proving that their statement of intent was false.

■ The government's legal argument fares no better. The government argues, in effect, that to require it to shoulder the entire burden of proof on the issue of the falsity of defendants' representation of intent improperly imports into this prosecution for false statements to a bank under 18 U.S.C. § 1014, a defense available only in a prosecution for perjury, under 18 U.S.C. §§ 1621 and 1623. The government urges this court to find that a literally true but intentionally misleading statement, while a complete defense to a prosecution for perjury, see *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), should not be considered a defense in a prosecution for false statement to a bank under § 1014. In substance, the government contends that "[t]o import the *Bronston* rule to this very different context would invite mischief and undermine the very purpose of the law." Government's Memo. in Opp. at 29.

In *Bronston*, the Supreme Court held that the perjury statute, 18 U.S.C. § 1621, does not reach a literally true but unresponsive answer, even if the witness had the intent to mislead the questioner, and even if the answer was "false by negative implication." 409 U.S. at 362, 93 S.Ct. 595. The government's contention that the *Bronston* defense should not be available in a § 1014 prosecution relies primarily on the Third Circuit's reasoning in *Ryan*, 828

F.2d at 1014. There, in dicta, the Third Circuit opined that, "it is at least questionable whether *Bronston* should apply to § 1014 prosecutions." *Id.* The court's doubts arose principally from language in the *Bronston* opinion suggesting that, as characterized in *Ryan*, it is the "adversary system, not the perjury statute, [that] is the safeguard" against an answer that is "unresponsive and misleading—though literally true." *Id.* Specifically, the court's expression of uncertainty focused on the following language in *Bronston:*

> "[W]e perceive no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert—as every counsel ought to be—to the incongruity of petitioner's unresponsive answer.... If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination."

*Id.* (quoting *Bronston*, 409 U.S. at 358–59, 93 S.Ct. 595). From this passage in the *Bronston* opinion, the *Ryan* court reasoned that although, in the context of a perjury prosecution, it may be a "valid assumption" that "an alert legal adversary [is available] who can bring the evasive witness 'back to the mark,' ... the same cannot be said of cases under § 1014, in which the putatively false statement is generally made in the informal context of a bank loan application." *Id.*

In arguing the impropriety of invoking the *Bronston* defense in this § 1014 prosecution, the government, as did the *Ryan* court, cites the informality of the context of a bank loan, and urges, further, that a bank loan, unlike an examination under oath, is a "business transaction" rather than "legal encounter," and does not generally require the services of an attorney. The government also contends that the availability of the *Bronston* defense would subvert the purpose of the bank false

statement statute, which it identifies as the "protect[ion] of the federal, nationwide banking system." Government's Memo. in Opp. at 29.

At the outset, is should be noted that no court has held the *Bronston* defense unavailable in a § 1014 prosecution. As the government acknowledges, the *Ryan* court's discussion of the issue was in dicta, as was the discussion of the First Circuit in *United States v. Attick,* 649 F.2d 61, 63 (1st Cir.), *cert. denied,* 454 U.S. 861, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981), which reached the opposite conclusion—that the literal truth defense *is* available in § 1014 prosecutions.[4]

More importantly, there is a plethora of case law, including authority from the Second Circuit, holding that the *Bronston* defense *is* available in prosecutions under other false statement statutes. Thus, as discussed above, a decade before *Bronston* was decided, the Second Circuit held the defense available in false statement prosecutions under 18 U.S.C. §§ 1001 and 1546, *see Diogo,* 320 F.2d at 907, and no subsequent case has been found suggesting that this precedent lacks continuing vitality in this circuit. Since *Diogo,* the other circuits that have directly addressed the issue—the Fifth, Sixth, Eighth, and Tenth Circuits—have held the *Bronston* defense available in prosecutions for false statement under 18 U.S.C. § 1001. *See, e.g., United States v. Gatewood,* 173 F.3d 983, 988 (6th Cir.1999) (holding evidence insufficient to support conviction under § 1001 as the government failed to "negative any reasonable interpretation that would make the defendant's statement factually correct") (*quoting United States v. Gahagan,* 881 F.2d 1380, 1383–84 (6th Cir.1989) (*quoting Diogo,* 320 F.2d at 907)); *United States v. Moses,* 94 F.3d 182, 188 (5th Cir.1996) (holding evidence insufficient to support § 1001 conviction for making a

false representation on an Immigration and Naturalization Service form, because the statement, although misleading, was literally true); *United States v. Hixon,* 987 F.2d 1261, 1267–68 (6th Cir.1993) (reversing § 1001 conviction because there was no evidence from which jury could find beyond a reasonable doubt the falsity of a literally true statement made in connection with receipt of disability benefits); *United States v. Vesaas,* 586 F.2d 101, 104 (8th Cir.1978) ("a prosecution for a false statement under § 1001 . . . cannot be based on an ambiguous question where the response may be literally and factually correct. . . . [A]ssuming that we could . . . uphold the validity of the indictment we would still be compelled to find that the evidence is clearly insufficient to sustain a conviction under § 1001"); and *United States v. Anderson,* 579 F.2d 455, 459–60 (8th Cir. 1978) (reversing convictions under § 1001 for false statements in certification of reimbursement invoices because statements were "ambiguous," rendering it "incumbent upon the government" to prove falsity by "negat[ing] any reasonable interpretation that would make the defendant's statement factually correct," a burden the government did not meet). In a different context, that of proper jury instructions in a § 1001 prosecution where the statement alleged as false is ambiguous, the Tenth Circuit also endorsed the view that: "In cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous." *United States v. Migliaccio,* 34 F.3d 1517, 1525 (10th Cir.1994).

Finally, the Eighth Circuit has also held the *Bronston* defense available in a prose-

---

4. As the government argues, the availability of the *Bronston* defense was not the subject of a direct holding in *United States v. Weiss,* 930 F.2d 185 (2d Cir.1991), a prosecution for making false statements on medicare and

medicaid forms, in violation of 42 U.S.C. § 1395nn(a)(1), as the court rejected the defense on the ground that the evidence was sufficient to support the inference that the statements at issue were false.

cution for false statements to the Department of Housing and Urban Development, in violation of 15 U.S.C. § 1717. *See United States v. Steinhilber,* 484 F.2d 386, 389–90 (8th Cir.1973) (holding that "the meaning of the words in question was ambiguous and the Government had the burden of negating the claim that the defendant 'did not know the falsity of his statement at the time it was made …,'" a burden the government failed to sustain).

It is true that none of the above authorities addresses the *Bronston* defense in the context of a § 1014 prosecution. But it is difficult to discern a distinction between § 1014 and the false statement statutes at issue in those cases—that is, 18 U.S.C. § 1001, 18 U.S.C. § 1546 and 15 U.S.C. § 1717—that would suggest any reason why the defense, although available in prosecutions for violation of the latter statutes, should be unavailable in a prosecution under § 1014. The observation by the *Ryan* court, echoed by the government here, that the context of a bank loan is a relatively informal one, does not supply such a distinction. Submitting a sworn application to a bank for a loan would seem to entail no less indicia of formality than, for example, providing documentation to the Immigration and Naturalization Service, *Diogo,* 320 F.2d 898, submitting certified invoices to the Department of the Navy, *Gatewood,* 173 F.3d 983, making claims for continuing disability compensation, *Hixon,* 987 F.2d 1261, or a real estate developer's filing with the Department of Housing and Urban Development of a statement regarding the availability of water, *Steinhilber,* 484 F.2d 386. Similarly, like a loan application to a bank, the latter contexts do not regularly involve the use of a lawyer, and they cannot all fairly be characterized more as "legal encounters" than as simple "business transactions." Nor is it evident that the asserted purpose of § 1014, the protection of the banking system, would be subverted by the allowance of a *Bronston* defense, when the purpose of § 1001, the protection of

the authorized functions of governmental departments and agencies, would not.

In sum, there is no basis in this case for declining to require that the government shoulder its full burden of proving beyond a reasonable doubt the falsity of defendants' statement to the bank that forms the basis of its § 1014 prosecution. Because the government has not disproved the "literal truth" of one reasonable construction of that statement, apparently the sole interpretation amenable to agreement among reasonable jurors—that is, the borrowers intended, at the time they signed the loan application, to make some nominal improvement to their home after the loan closed—the government's proof of this essential element of the § 1014 charge fails as a matter of law.

## CONCLUSION

Because the government's § 1014 charge alleges as false a statement that, in the circumstances of this case, was "fundamentally ambiguous," the charge should not have been submitted to the jury. Alternatively, because the government's proof failed to negate one, if not the only reasonable interpretation that would have made the statement true, the government has failed to sustain its burden of establishing an essential element of that charge. Further, since conviction of the § 1014 charge is, in the circumstances of this case, a necessary predicate for conviction of all of the remaining charges, defendants' Rule 29(c) motions are granted with respect to all counts.

The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.