UNITED STATES of America,
Plaintiff,

v.

Fawaz Mohammed DAMRAH, aka
Fawaz Damra Defendant.

No. 1:03–CR–484.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 13, 2004.

Cherie L. Krigsman, U.S. Department of Justice, Washington, DC, James V. Moroney, Jr., Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

Larry W. Zukerman, Zukerman, Daiker & Lear, Cleveland, OH, John D. Cline, Jones Day, San Francisco, CA, Nancy Hollander, Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, Albuquerque, NM, Defendant.

## AMENDED MEMORANDUM OPINION AND ORDER [1]

GWIN, District Judge.

Currently before the Court is Defendant Fawaz Mohammad Damrah's motion for a judgment of acquittal, or in the alternative, for a new trial. This motion follows a jury's verdict, finding Damrah guilty of unlawfully obtaining citizenship, in violation of 18 U.S.C. § 1425 by making false statements to Immigration and Naturalization Services officials when he applied for citizenship over a decade ago. For the reasons that follow, the Court DENIES Damrah's motion.

### BACKGROUND

Born in 1961 in Nablus—a city located in what is now the West Bank—Fawaz Mohammad Damrah ("Damrah") did not move to the United States until 1984, after he had already graduated from the University of Jordan. That year, he came to Chicago to work as the imam, or Islamic spiritual leader, of a mosque. Two years

---

1. On August 30, 2004, the Court filed a memorandum opinion denying Damrah's motion for acquittal or for a new trial [Doc. 178]. This memorandum opinion and order corrects certain minor software problems and phrasing problems found in the earlier filing.

later, Damrah moved to Brooklyn, New York, to become the imam of the al-Farooq mosque, a mosque with some members who supported a radical version of the Islamic faith. After four years at al-Farooq, Damrah left Brooklyn and moved to Cleveland in 1990.

Since 1991, Damrah has worked as the imam of the largest mosque in the Greater Cleveland area, the Islamic Center of Cleveland. A permanent resident of the United States since 1988, Damrah applied for United States citizenship in 1993. On October 18, 1993, Damrah filled out a Form N–400—an official government form entitled "Application for Naturalization." The form contained questions regarding Damrah's work history, his family, his affiliations, and various other questions.

On December 17, 1993, Immigration and Naturalization Services [2] examiner Kim Adams conducted a naturalization interview of Damrah. In that interview, Adams reviewed with Damrah his answers to each question on the Form N–400 to ensure their accuracy and completeness. Additionally, Adams provided Damrah the opportunity to ask any clarifying questions regarding the Form N–400's questions. Adams lacked scripted answers to explain what various terms on the Form N–400 meant. At trial, she testified that when naturalization applicants sought clarification, she did her best to explain the terms to them in a way that they could understand. (Tr. 329, 336). In the end, Damrah did not change the answers to any of the Form N–400's questions during his naturalization interview with Kim Adams. On the basis of Damrah's statements on his Form N–400 and in the interview with Kim Adams, the United States of America granted him naturalization, and he became a citizen on April 29, 1994. Since that time, he has resided in Cleveland and has continued serving as the imam of the Islamic Center of Cleveland.

As the imam of the Islamic Center of Cleveland, Damrah gained a local reputation as a leader of the interfaith community who strove to bridge the gaps separating the Christian, Jewish, and Muslim faiths. In the wake of the tragedies of 9/11, this role became even more pronounced. However, only months after 9/11, videos depicting a different side of Damrah surfaced. Local news stations aired videos taken in 1991 in which Damrah introduced leaders of Palestinian support organizations, praised attacks against Israelis during the first Intifada, made several apparently anti-Semitic remarks,[3] and solicited donations to fund the work of these groups, some of which claimed responsibility for deadly attacks in Israel.

On December 16, 2003, a grand jury in the Northern District of Ohio issued an indictment charging Damrah with wrongful procurement of citizenship in violation of 18 U.S.C. § 1425. After a lengthy pretrial period, Damrah's trial on these charges commenced on June 15, 2004. Two days later, the trial terminated with a jury verdict of guilty. Damrah now chal-

---

2. Due to a recent change of the agency's name, Ms. Adams actually works for the United States Citizen and Naturalization Services. Because the agency was known by the moniker, "Immigration and Naturalization Services" at all times relevant to this case, the Court uses its former name in this opinion.

3. One such remark referred to Jews as "the sons of monkeys and pigs." The Court heard testimony during a *Daubert* hearing that this remark might not have been as blatantly anti-Semitic as it first appears. A proposed defense expert on Islamic history testified that Damrah's "sons of apes and swine" comment may have been a reference to a Koranic verse. Another proposed defense expert related that Israelis used similar language when referring to Palestinians, including statements used by Yitzhak Rabin encouraging Israelis to break the arms and legs of Palestinian protestors.

lenges that verdict, moving the Court to grant a judgment of acquittal notwithstanding the verdict, or in the alternative, to order a new trial. The Court considers Damrah's arguments in favor of his motion—as well as the United States' ("Government's") arguments against it.

## ANALYSIS

Damrah currently moves for both a motion for a verdict of acquittal under Federal Rule of Criminal Procedure 29, and a motion for a new trial under Federal Rule 33. To simplify its analysis, the Court treats Damrah's motion as two separate motions (one under each Rule), and it addresses each one separately.

### I. Rule 29 Motion for a Verdict of Acquittal

#### A. Standard of Review

In reviewing a motion for a judgment of acquittal notwithstanding a guilty verdict, the Court must view the evidence and draw all inferences in the light most favorable to the Government. *United States v. Riffe*, 28 F.3d 565, 567 (6th Cir.1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). After doing so, it may grant a motion overturning the jury verdict only if no rational juror could find the defendant guilty beyond a reasonable doubt. *Id.* Because the Government must prove the defendant guilty of each element beyond a reasonable doubt, *see In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), this standard of review applies to each element of the offense.

In this case, the Government charged Damrah with a single count of committing a single offense. However, it alleged multiple factual specifications sufficient to constitute that offense. To demonstrate, one of the ways that the Government says Damrah "unlawfully" obtained citizenship, in violation of 18 U.S.C. § 1425(a), is that he made various false statements on his application for naturalization, and that these false statements violate 18 U.S.C. § 1001.[4] These false statements include

(1) denying that he had ever engaged in the persecution of others because of their religion;

(2), (3), & (4) failing to disclose his membership in three groups;[5] and/or

(5), (6), & (7) failing to disclose his affiliation with the same three groups.

Additionally, the Government charged that these same allegedly false statements violate 18 U.S.C. § 1015,[6] and cites this as an

---

4. Section 1001 generally prohibits making false statements in any matter within the jurisdiction of the United States. It provides:
 Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
 (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
 (2) makes any materially false, fictitious, or fraudulent statement or representation; or
 (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
 shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001(a).

5. The groups are the Palestinian Islamic Jihad, the Islamic Committee for Palestine, and the Al–Kifah Refugee Center.

6. Section 1015 generally prohibits making false statements in naturalization proceedings. The portions of the statute relevant to this case provide:
 (a) Whoever knowingly makes any false statement under oath, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization, citizenship, or registry of aliens ... Shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1015(a).

alternative theory to support the charged violation of 18 U.S.C. § 1425(a). Finally, the Government alleged that Damrah obtained citizenship when he was not entitled to do so, in violation of 18 U.S.C. § 1425(b). Thus, the Government offers at least fifteen different theories (one for each of the seven false statements that allegedly violates § 1001, one for each false statement that allegedly violates § 1015, and one for obtaining citizenship when he was not entitled to do so) in support of the single charged offense. Each of these theories serves as a factual specification upon which the jury may have based its guilty verdict.

A threshold question exists as to whether the Government must demonstrate that it proved Damrah guilty beyond a reasonable doubt not only of each element of the offense, but also of each factual specification sufficient to support the verdict. In other words, the question asks whether to sustain the jury's verdict, the Government must show that it proved the falsity of all seven statements beyond a reasonable doubt, or, rather only the falsity of a single statement. Before addressing the substance of Damrah's motion, the Court focuses on this threshold question.

In *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the United States Supreme Court held that a general guilty verdict on a multiple-object conspiracy charge was valid even if the evidence was inadequate to support conviction as to one of the objects. Writing for the Court, Justice Scalia noted that

> It was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action.

*Id.* at 49, 112 S.Ct. 466.

In its analysis, the *Griffin* Court distinguished *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). In *Yates*, the Court held that where one of the two charged grounds was insufficient as a matter of law (because it fell outside the applicable statute of limitations) "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* at 312, 77 S.Ct. 1064. The *Griffin* Court distinguished *Yates* by noting that *Yates*, and the cases upon which it relied, dealt with situations where one of the charged grounds was insufficient *at law. Id.* at 52–55. In those cases, a jury verdict is not worthy of confidence because "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law[.]" *Id.* at 59, 112 S.Ct. 466. However, in cases like *Griffin*, where the jury lacked adequate *evidence* to convict on one of the charged grounds, the jury verdict may stand even after an appellate court determines that one of the multiple charged grounds lacked sufficient evidence to support a conviction. The reason such verdicts may stand is that "jurors *are* well equipped to analyze the evidence." *Id.* (citing *Duncan v. Louisiana*, 391 U.S. 145, 157, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)).

■ From the Supreme Court's analysis in *Griffin*, then, it seems clear that the jury verdict cannot stand if any of the charged factual specifications is *legally insufficient* to support a jury verdict. If, however, the Court finds that all the charged grounds can legally support a verdict, then the verdict will stand so long as sufficient evidence exists to support a

guilty verdict on a single charged theory. This holds true even if the Government failed to produce evidence sufficient to support a guilty verdict on all of the remaining charged theories. Having answered this threshold question, the Court turns to Damrah's arguments.

## B. Challenges to the Legal Sufficiency of the Verdict

Damrah offers two challenges to the legal sufficiency of the verdict. In these challenges, he argues that the words "persecution" and "affiliation" are fundamentally ambiguous, and therefore legally insufficient to support a guilty verdict. As explained below, the Court finds that neither word is fundamentally ambiguous, and therefore concludes that the indictment and the Government's evidence are legally sufficient to support a guilty verdict.

█ Various courts have held that a question that is fundamentally ambiguous cannot serve as the basis for a false statement prosecution. *See, e.g., United States v. Farmer*, 137 F.3d 1265 (10th Cir.1998); *United States v. Markiewicz*, 978 F.2d 786 (2d Cir.1992); *United States v. Manapat*, 928 F.2d 1097 (11th Cir.1991); *United States v. Ryan*, 828 F.2d 1010 (3d Cir. 1987); *United States v. Lighte*, 782 F.2d 367 (2d Cir.1986). Not all ambiguity, however, rises to the level of fundamental ambiguity. Generally, questions of ambiguity are left to the jury to resolve. *See, e.g., Ryan*, 828 F.2d at 1015 ("Normally, it is for the petit jury to decide which construction the defendant placed on the question."); *United States v. Bonacorsa*, 528 F.2d 1218 (2d Cir.1976) ("Absent fundamental ambiguity or impreciseness in the questioning, the meaning and truthfulness of [a defendant's] answer [is] for the jury."). However, when a statement is *fundamentally* ambiguous, it is "too ambiguous to allow a jury to speculate as to the defendant's intentions at the time she filled out the application form." *Manapat*, 928 F.2d at 1101. In such cases, answers to fundamentally ambiguous questions may not serve as the basis for perjury or false statement prosecutions as a matter of law. *Ryan*, 828 F.2d at 1015.

Determining the point at which ambiguity rises to the level of fundamental ambiguity is a difficult task. As the Second Circuit put it, "The phrase 'fundamentally ambiguous' has itself proven to be fundamentally ambiguous." *Lighte*, 782 F.2d at 375. Courts have stated that a question becomes fundamentally ambiguous when it lacks a meaning that men of ordinary intellect could agree on, or one that could be mutually understood by a questioner and answerer unless defined at the time sought. *Ryan*, 828 F.2d at 1015; *Lighte*, 782 F.2d at 375; *United States v. Lattimore*, 127 F.Supp. 405, 410 (D.D.C.), *aff'd by an equally divided court*, 232 F.2d 334 (D.C.Cir.1955). Other courts have phrased the standard slightly differently, identifying fundamentally ambiguous questions as those in which "it [is] entirely unreasonable to expect that the defendant understood the question posed to him." *Ryan*, 828 F.2d at 1015 (quoting *United States v. Slawik*, 548 F.2d 75, 86 (3d Cir. 1977)) (brackets in original). Recognizing fundamental ambiguity as a defense has two purposes: (1) to preclude convictions grounded on surmise or conjecture; and (2) to prevent witnesses from unfairly bearing the risks of inadequate examination, and applicants from unfairly bearing the risks of inadequate forms. *See Ryan*, 828 F.2d at 1015.

In cases where the defendant raises the defense of fundamental ambiguity, context is paramount. *Farmer*, 137 F.3d at 1269. For instance, courts have found fundamental ambiguity in cases where an attorney or investigator posed questions to the de-

fendant but did not specify whether those questions referred to the defendant's actions in her personal or official capacity. *See, e.g., Markiewicz,* 978 F.2d 786; *Lighte,* 782 F.2d 367.

Similarly, in *United States v. Manapat,* 928 F.2d 1097 (11th Cir.1991), the Eleventh Circuit affirmed an acquittal on the grounds of fundamental ambiguity as a result of the structure of the form that was the basis of the prosecution. There, the defendant applied for an Airman Medical Certificate to the Federal Aviation Administration. The application included a section entitled "Medical History" that contained twenty-four questions regarding "conditions." The first twenty-one "conditions" questions were all medical in nature. The twenty-second and twenty-third questions, however, inquired about convictions (one about "traffic convictions," the other about "other convictions"). Manapat answered in the negative to both question twenty-two and question twenty-three, and these answers became the basis for his prosecution under 18 U.S.C. § 1001, which prohibits "knowingly and willfully" making false statements to any department or agency of the United States. In affirming the district court's decision to dismiss the indictment, the Eleventh Circuit stated

> Although the single statements "Record of traffic convictions," or "Record of other convictions" may not be ambiguous standing alone, they become quite confusing when buried in a list headed "Medical History" and purportedly concerned with medical conditions.... In order to successfully prosecute an indictment for making a false statement, the government must not remove questions from the context in which their answers were given in an attempt to prove their clarity.

*Id.* at 1101.

Keeping the elusive standard of fundamental ambiguity and the importance of context in mind, the Court considers Damrah's arguments.

### 1. The Persecution Question

■ Part 7 of the Form N–400 bears the label "Additional Eligibility Factors." Question 3 of Part 7 asks, "Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?" On October 18, 1993, when he filled out his Form N–400, Damrah checked the box corresponding to an answer of "No." He affirmed this answer in his December 17, 1993 naturalization interview with INS agent Kim Adams. In its indictment, the Government alleges that this statement was false, and thus violates 18 U.S.C. § 1001 and 18 U.S.C. § 1015. Damrah now argues that "persecution" is a fundamentally ambiguous term, and therefore the Court erred by sending this theory to the jury for deliberation.

Damrah offers three primary arguments in support of his contention that "persecution" is a fundamentally ambiguous term. First, he notes that it is undefined by statute, regulation, or the Form N–400. Second, he argues that Kim Adams, the INS examiner, did not employ a standard definition when naturalization applicants asked her what persecution means. Third, Damrah argues that because the persecution question followed a question regarding membership in the Nazi Party, the question was fundamentally ambiguous in the context in which it was presented. As described below, the Court concludes that none of these arguments successfully demonstrate that the persecution question was fundamentally ambiguous.

Words need not be defined in statutes, in regulations, or on government forms to be free from fundamental ambiguity. Damrah is correct that the Sixth Circuit

has noted in dicta that "relevant statutes and regulations offer no working definition of persecution." *Ouda v. INS,* 324 F.3d 445, 452 (6th Cir.2003). What Damrah fails to note, however, is that the lack of a "working definition" has not stopped courts from determining whether particular asylum-seekers faced threats of persecution. *See, e.g., Mikhailevitch v. INS,* 146 F.3d 384, 390 (6th Cir.1998) (holding that the term "persecution" encompasses "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty"). Just the same, juries and naturalization applicants are perfectly capable of interpreting "persecution," and of deciding whether a particular set of actions qualifies as persecution.

Damrah also attacks INS employee Kim Adams' use of varying definitions and examples to explain the meaning of "persecution" to naturalization applicants. Adams' testimony at trial established that she did not have a scripted definition, fresh from the pages of *Webster's Dictionary,* prepared to read to applicants who were uncertain as to the meaning.[7] At times, she would use the Holocaust in Nazi Germany—perhaps recent history's most extreme exemplar of persecution—as an example. (Tr. 329). While this example could certainly lead applicants to understand persecution as requiring murder, a reasonable applicant would not view the state-sanctioned, systematic murder of six million people as a threshold to an act's qualifying as persecution. Also, Adams testified that the Nazi Holocaust was not the only example she would use. While being cross-examined, Adams testified,

---

7. With regard to the persecution question on Form N–400, Adams testified:

Q Was there any sort of standardized definition of persecution that you as an INS employee were told to give?

Q What other historical examples do you give to illustrate the term persecution?

A Depending on the time. At the point I don't remember.

In 1993 there was examples of Poland. There were people fleeing Poland for reasons of persecution. There were individuals who were coming from eastern Europe.

There were individuals who were undergoing different forms of persecution in some of the Carribean nations. In Haiti and some of the African nations, Somalia.

Again, it depended on the applicant and what was going on at that point as to what reference may have been used to help them understand.

(Tr. 352–53).

Evidence at trial demonstrated that Damrah had praised religiously motivated attacks and used those attacks as a basis to encourage attendees at public rallies to donate money to the organization responsible for such attacks. On one of the videos, he said,

I ask you to donate to Islamic Jihad. Nidal Zalloum, who stood. Nidal Zalloum, of Islamic Jihad, who grabbed a dagger and stabbed four Jews in the courtyard of the Holy Sanctuary. Nidal Zalloum, from Islamic Jihad, is saying to you, "be compassionate upon my blood. Avenge my blood." And that mujahid, who took the bus and killed more than twenty Jews. He is from Islamic Jihad. This is the Islamic Jihad Movement. I say to you to donate, so that this money will serve you with God.

A No.

(Tr. 354).

Gov't Exh. 8–5. Under even a severe definition of "persecution," praising such actions and raising money for an organization under the auspices of which the actions occurred could qualify as inciting, assisting, or otherwise participating in persecution.

Damrah's final argument that the persecution question is fundamentally ambiguous—that the context of the Form N–400 rendered the word fundamentally ambiguous—also misses the mark. As previously noted, context is critically important in deciding whether a question is fundamentally ambiguous. However, reading the persecution question in context does nothing to amplify whatever ambiguity the term "persecution" possesses. Damrah claims that because the persecution question follows a question asking about affiliation with the Nazi Government of Germany, a reasonable reader would understand "persecution" to be synonymous with the actions of the Nazis. This argument is flawed for two reasons. First, the fact that the Form N–400 contains a question about Nazism and a question about persecution renders it implausible that the two questions seek the same information. A reasonable reader would not read Question 3 (the persecution question) as merely a different way of asking Question 2 (the Nazi question). Instead, a reasonable reader would understand that if the government placed these two separate questions on the Form N–400, it must have sought information on two separate matters.

Second, examining the structure of both Question 2 and Question 3 demonstrates the implausibility of Damrah's argument. To illustrate, the Court copies the text and formatting of both questions:

2. During the period March 23, 1933 to May 8, 1945, did you serve in, or were you in any way affiliated with, either directly or indirectly, any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, citizen unit of the Nazi party or SS, government agency or office, extermination camp, concentration camp, prisoner of war camp, prison, labor camp, detention camp, or transit camp, under the control or affiliated with:

 a. The Nazi Government of Germany?

 b. Any government in any area occupied by, allied with, or established with the assistance or cooperation of, the Nazi Government of Germany?

3. Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?

To the right of Questions 2a, 2b, and 3 lie boxes corresponding to answers of "Yes" and "No;" the applicant is to check the box corresponding to a truthful answer. Clearly, the way Form N–400 breaks down the questions demonstrates that they are asking two different things. The Nazi question contains two sub-parts. If the persecution question were intended as an additional element of the Nazi question, it would be labeled Question 2c rather than Question 3. A reasonable applicant would recognize as much.

Additionally, the structuring of the persecution and Nazi questions on Form N–400 renders this case distinguishable from *Manapat*. There, two questions regarding an arrest record were included in the midst of twenty-two other questions regarding medical issues, and all twenty-four questions fell under the heading of "Medical History." In such a context, questions about arrests would be inherently confusing and thus fundamentally ambiguous. Not so with the questions on the Form N–

400. For these reasons, Damrah's final attack on the persecution question is meritless.

These arguments aside, the Court concludes that while "persecution" may be arguably ambiguous, it is not fundamentally ambiguous. The term is commonly used in both everyday conversation and political discourse.[8] While people may debate as to whether a particular act of ill will qualifies as an act of persecution, this demonstrates only that the definition's contours may not be crystal-clear. The definition's core—which entails malicious physical abuse or deprivation of liberty on account of another's ancestry, race, religion, or creed—is sufficiently clear to permit two people of average intellect to conduct such a debate intelligently. Thus, any ambiguity inherent in the term "persecution" is of the *arguable,* not the *fundamental,* variety, and the Court's decision to send the persecution question to the jury was proper.

Further, the Court notes that it clearly instructed the jury on the meaning of "persecution," and that this instruction was sufficient to eradicate whatever arguable ambiguity the term carries. The Court instructed the jury as follows:

> The indictment alleges that Mr. Damrah assisted and incited the persecution of Jews and others. Persecution is the infliction of physical punishment, harm, or a significant deprivation of liberty on account of a person's race, religion, national origin, or political opinions. Persecution does not include every sort of treatment our society regards as offensive. Harassment or discrimination does not ordinarily amount to persecution for these purposes, although it can, in extraordinary cases, be so severe and pervasive as to constitute persecution.

As the instruction demonstrates, the Court sufficiently circumscribed the jury's consideration of the meaning of "persecution." The instruction makes clear that the jury was not in a position to speculate about whether conduct that is merely offensive qualifies as persecution. Thus, the Court concludes that not only was the decision to allow the jury to deliberate on the persecution question, but further that the Court provided the jury with instructions adequate to ensure that the jury did so fairly and clearly.

### 2. The Affiliation Question

 Part 9 of Form N–400 requires naturalization applicants to list their "present and past ... affiliation with every organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place." It further instructs them to "[i]nclude the name of organization, location, dates of membership and the nature of the organization. If additional space is needed, use separate paper." On his Form N–400, Damrah listed only the Islamic Center of Cleveland and the Islamic Council of Ohio as organizations with which he was a member or was otherwise affiliated. He did not mention the Palestinian Islamic Jihad, the Islamic Committee for Palestine, or the Al–Kifah Refugee Center (also known as Afghan Refugee Services, Inc.). The Government alleges that Damrah was a member of, or was affiliated with, all three organizations, and that he violated both 18

---

8. Searches of the WestNews database reveal that major newspapers use the term with relative frequency. In just the month between July 14, 2004, and August 13, 2004, at least three newspapers (the *Washington Post,* the *Los Angeles Times,* and the *Chicago Tribune*) with broad regional and even national readerships employed the term "persecution" at least fifteen times each. The local newspaper, *The Plain Dealer,* used the word once in the past month. *See* Jesse Tinsley, "Children's Games Athlete Trying to Defect," *The Plain Dealer,* Aug. 9, 2004, at A1.

U.S.C. § 1001 and 18 U.S.C. § 1015 by omitting his relationship with these organizations.

Damrah argues that "affiliation" is a fundamentally ambiguous term, and thus, he was incapable of understanding the question. Upon these arguments, he asks the Court to grant him a judgment of acquittal under Federal Rule of Criminal Procedure 29.

The Court concludes that "affiliation" is not fundamentally ambiguous. Damrah notes that the Supreme Court has in the past upheld false statement convictions based on answers to questions regarding defendants' affiliations. *See, e.g., Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).[9] Yet he attempts to dodge these precedents by arguing that the lengthy jury instructions featured in those cases, as well as the Supreme Court's struggle to define "affiliation" in the context of a deportation, *see Bridges v. Wixon,* 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), demonstrate that the term is, in fact, fundamentally ambiguous.

The Court disagrees. The mere fact that the district courts in *Bryson* and *Killian* sent the cases to the jury indicates that "affiliation" is not fundamentally ambiguous. The fact that the Supreme Court sanctioned this action by upholding the convictions strongly bolsters this conclusion. Indeed, if "affiliation" were a fundamentally ambiguous term, then any prosecution based upon a defendant's answer to a question regarding his affiliations would be void as a matter of law, and sending such a case to the jury would be improper.[10] In both *Bryson* and *Killian,* the Supreme Court emphasized that a narrowly drawn jury instruction was sufficient to eradicate any vagueness or ambiguity. *See Bryson,* 396 U.S. at 69, 90 S.Ct. 355; *Killian,* 368 U.S. at 254–55, 82 S.Ct. 302. The fact remains that the Supreme Court twice concluded that "affiliation" can be defined clearly enough for a jury to understand the term.[11] That fact in itself, convinces the Court that "affiliation" is not fundamentally ambiguous.

The Court further notes the substantial similarity of its jury instruction to the

9. Both cases featured false-statement prosecutions where the defendants were labor union officers who had signed affidavits denying any affiliation with the Communist Party. Such affidavits were then required, under § 9(h) of the Labor Management Relations Act, for unions to use the processes of the National Labor Relations Board. *See Killian,* 368 U.S. at 245, 82 S.Ct. 302.

10. Thorough jury instructions are sufficient to fix arguable ambiguity, but not to fix fundamental ambiguity.

The different concerns animating the two types of ambiguity form the basis for this distinction. The doctrine of fundamental ambiguity holds that where an ambiguous word or phrase is so overwhelmingly devoid of meaning that it is unreasonable to speculate that the questioner and answerer assigned the same meaning to the word or phrase, the defendant's answer may not serve as the basis

of a prosecution. Thus, the doctrine rectifies the inherent unfairness in prosecuting someone for the particular meaning he ascribes to a word or phrase that lacks specific meaning.

The doctrine of arguable ambiguity, on the other hand, is not concerned with the inherent fairness of the prosecution. Instead, the concern animating this doctrine is ensuring that the jury is adequately constrained in its attempt to determine which meaning a defendant likely ascribed to an ambiguous word or phrase, and thus whether the defendant possessed the *mens rea* necessary to support a false statement conviction.

11. Further, the Court finds it notable that both of these cases post-date the birth of the distinction between fundamental and arguable ambiguity, which occurred in *United States v. Lattimore,* 127 F.Supp. 405 (D.D.C.), *aff'd by an equally divided court,* 232 F.2d 334 (D.C.Cir.1955).

instructions in *Bryson* and *Killian*. In this case, the Court instructed the jury as follows:

> The indictment alleges that Mr. Damrah made false statements regarding his "affiliation" with Afghan Refugees Services, Inc., Palestinian Islamic Jihad, and Islamic Committee for Palestine. "Affiliation" means a relationship short of and less than membership in an organization, but more than that of mere sympathy for the aims and objectives of the organization.
>
> A person may have an affiliation with an organization, even though not a member, when there is shown to be a close working alliance or association between him and the organization, together with a mutual understanding or recognition that the organization can rely and depend on him to cooperate with it, and to work for its benefit, for an indefinite future period upon a fairly permanent basis.

Similarly, the first three paragraphs of the "affiliation" jury instructions in *Bryson* and *Killian* read as follows:

> The verb "affiliated," as used in the Second Count of the indictment, means a relationship short of and less than membership in the Communist Party, but more than that of mere sympathy for the aims and objectives of the Communist Party.
>
> A person may be found to be 'affiliated' with an organization, even though not a member, when there is shown to be a close working alliance or association between him and the organization, together with a mutual understanding or recognition that the organization can rely and depend upon him to cooperate with it, and to work for its benefit, for an indefinite future period upon a fairly permanent basis.
>
> Briefly stated, affiliation as charged in the Second Count of the indictment, means a relationship which is equivalent or equal to that of membership in all but name.

*Bryson,* 396 U.S. at 69 n. 7, 90 S.Ct. 355; *Killian,* 368 U.S. at 276 n. 13, 82 S.Ct. 302.[12] The inclusion of the third paragraph

---

12. In both *Killian* and *Bryson,* the "affiliated" instructions included some additional explanations. In *Killian,* the court added,

> Whether or not the defendant was affiliated with the Communist Party at the time alleged in the indictment is a question of fact which you are to determine from all the evidence in the case. Affiliation or lack of affiliation in the Communist Party may be established by direct as well as circumstantial evidence.
>
> In determining the issue as to whether the defendant was or was not affiliated with the Communist Party at the time alleged in the indictment, you may take into consideration any statements made or acts done by the accused, and all other facts and circumstances in evidence which may aid determination of the issue.

82 S.Ct. at 325 n. 13. Similarly, the court in *Bryson* added,

> I tried to think of some analogy which would make that possibly clearer to you, and the best one I can think of—we have all in our experience probably heard of a man and woman who live together but are not married. They are husband and wife in everything but name only. You have probably heard that expression. A person to be affiliated with the Communist Party within the meaning of that term as used in the Second Count of the indictment must be a member in every sense and stand in the relationship of a member in every sense but that of the mere technicality of being a member,—in everything but name.

*Bryson,* 396 U.S. at 69 n. 7, 90 S.Ct. 355. The Court recognizes that these other courts' instructions were lengthier than those offered to the jury in the instant case. This distinction, however, is insufficient to render this Court's instruction at all substantively distinguishable from the instructions in *Bryson* and *Killian.* In short, it is a distinction without a difference.

in both *Bryson* and *Killian* indicates that this Court's instruction was even more narrowly drawn, in that it drew a greater distinction between membership and affiliation. Thus, if the *Bryson* and *Killian* courts' instructions were sufficient to clarify any ambiguity associated with the term "affiliation," then *a fortiori* this Court's instruction was sufficient. For these reasons, the Court rejects the notion that affiliation is a fundamentally ambiguous term.

Because the Court has concluded that neither "persecution" nor "affiliation" are fundamentally ambiguous terms, it concludes that the charges against Damrah were legally sufficient to sustain a guilty verdict. Thus, the Court did not err by sending these charges to the jury. The Court must now determine whether the Government presented evidence sufficient for a reasonable jury to convict Damrah.

## C. Challenges to the Sufficiency of the Evidence

In addition to attacking the legal sufficiency of the Government's case, Damrah also argues that the evidence offered at trial was insufficient to support a guilty verdict. With this argument, Damrah attacks various ones of the alternative factual theories upon which the Government premised its case. However, because *Griffin* establishes that a jury's guilty verdict will stand so long as the Government offered sufficient evidence to support *any* of the alternative factual theories upon which the guilty conviction may have rested, the Court need not address each of these arguments. Instead, the Court considers whether the evidence offered at trial, considered in the light most favorable to the Government, adequately supports any theory under which a rational jury may have found Damrah guilty.

■ The Court concludes that the jury possessed sufficient evidence to find Damrah guilty of violating 18 U.S.C. § 1001(a), and thereby unlawfully obtaining citizenship in violation of 18 U.S.C. § 1425(a). Among the exhibits admitted into evidence and considered by the jury were a number of wiretap intercepts of communications between Damrah and Dr. Sami Al–Arian. These communications occurred between January 1994 and April 1994, the month in which Damrah obtained naturalization, and included rather detailed discussion of fundraising activities. For instance, on January 17, 1994, the following exchange occurred between Damrah and Al–Arian:

> Al–Arian: In the end, how much did they collect?
>
> Damrah: By God, ten and a little more, almost. Someone had donated five-and-a-half before the fund-raising.
>
> Al–Arian: Hmm ...
>
> Damrah: So, it amounted to fifteen-and-a-half, I mean, you see.
>
> Al–Arian: Ehh ... they (unintelligible)!
>
> Damrah: (Unintelligible).
>
> Al–Arian: No; two-hundred fifteen-and-a-half thousand is good.
>
> Damrah: By God, we could have done better....

Gov't Exh. 23–2.

In subsequent conversations, the two discuss a scheme designed to magnify the amount of donations. The two would accomplish this scheme by funneling the donations to wealthy individuals, who would then re-donate them, take a tax write-off based upon this "donation," and finally donate part of that write-off back to the organization. For instance, on March 6, 1994, the following exchange between the two took place:

> Al–Arian: I collected approximately 25,000.00 cash, they were available on the spot.
>
> Damrah: Are you serious?

Al–Arian: Yes.

Damrah: If they hand them over to us, we will give them 30.

Al–Arian: What?

Damrah: If they lend them to us, we will give them 30 in exchange.

Al–Arian: You will give them how much?

Damrah: Thirty

Al–Arian: Thirty what?

Damrah: Thirty thousand.

Al–Arian: Are you sure?

Damrah: Bring them to us.

. . . . .

Damrah: And how shall we deliver them? Do they have tax exempt?

Al–Arian: Of course they do.

Damrah: Let them give us cash and (inaudible).

Al–Arian: That's it. I will let someone deliver them to you by hand.

Gov't Exh. 28–2. Later, in the same conversation, the following exchange occurs:

Damrah: How much would he make out of them?

Al–Arian: He will make eight thousand out of them.

Damrah: How?

Al–Arian: My brother, if I give him 20, and he gives me back 28, then it's even. He didn't even contribute a single penny. If I give him 20 and he gives me back 20, this means that he contributed two thousand.

Damrah: Based on what? On 40% tax?

Al–Arian: Yes.

Damrah: Ha, ha, ha.

Al–Arian: My brother, all of those are 40%, let me tell you.

Damrah: Oh my God!

Al–Arian: All of them, everyone with more than 200 thousand income, pays 100%.

Gov't Exh. 28–2. Evidence submitted to the jury also established that Damrah had solicited donations at PIJ/ICP fund-raisers in the past,[13] and that Dr. Sami Al–Arian was the President of ICP.[14] Further, in one video submitted as evidence, Damrah indicated that the ICP was merely a front for the PIJ. He stated, "A brief note about the Islamic Committee for Palestine: It is the active arm of the Islamic Jihad Movement in Palestine. We preferred to call it the 'Islamic Committee for Palestine' for security reasons." Gov't Exh. 8–5.

From this evidence, a rational jury could conclude that Damrah was a member of the ICP and/or the PIJ. In its jury instructions, the Court defined "membership" as follows:

"Membership" in an organization constitutes the state of being one of those persons who belong to or comprise the organization. It connotes a status of mutuality between the individual and the organization. That is to say, there must be present the desire on the part of the individual to belong to the organization and a recognition by the organization that it considers him a member.

The wiretap intercepts show Damrah and a high-ranking member of both ICP and PIJ discussing ways to bolster the organizations' financing. Further, the scheme they discuss is illegal, and Damrah indicates he knows as much. In the March 6, 1994 conversation, he asks Al–Arian, "Do you want to implicate me in

---

**13.** For example, Government Exhibits 7–5, 8–5, and 9–4 are all videotapes depicting PIJ and ICP rallies and conferences in which Damrah took the stage to introduce participants and/or to actively solicit donations from the audience.

**14.** In more than one video, Damrah introduced Al–Arian as the President of ICP. Government's Exhibits 7–5 & 8–5. Additionally, Government terrorism expert Matthew Levitt testified that Al–Arian is the President of ICP. (Tr. 523).

this?" after Al–Arian indicates that he will initiate the scheme by sending Damrah a $20,000 check made out to Damrah. Gov't Exh. 28–2.

From the fact that Damrah was willing to undertake illegal activities and to expose himself to potential legal liability in order to aid the organization, a rational jury may conclude that Damrah felt "a status of mutuality" with the organizations. Likewise, a rational jury could conclude from these discussions that because a high-ranking member of the organizations was willing to discuss matters as important and as risky as this money-laundering scheme, that high-ranking member-and by implication, the organizations themselves-considered Damrah a member of the organizations.

If this evidence were not enough, the jury could find also conclude that Damrah was a member of PIJ/ICP at the time he procured naturalization based upon representations of membership in one of the intercepted phone calls. On April 2, 1994, Al–Arian attempted to persuade Damrah to attend a "[joint] activity between the Union and the Committee," telling Damrah "we want somebody who works well at fundraising." In attempting to persuade Damrah to commit, Al–Arian said, "I will tell them that you are the committee's representative in the Midwest." Shortly thereafter, the following exchange took place:

> Al–Arian: ... We don't want to go alone. This, this will most likely be well arranged because all powers are participating.
>
> . . . . .
>
> Damrah: In other words, not just us? They say the union is there and the Pakistani Brothers ... will they be going? ... Will the Islamic Union be there?
>
> Al–Arian: Yes; what do you think I'm telling you?

Gov't Exh. 30–2. While the exact meaning of this exchange is not fully clear, a rational jury could conclude that the references to "the Committee" were actually references to ICP and that Damrah's reference to "us" was also a reference to ICP. This potential admission of membership and Al–Arian's willingness to label Damrah a "representative" of the Committee provide additional bases upon which a jury could conclude that Damrah was a member of PIJ/ICP.

For all the above reasons, a rational jury could conclude beyond a reasonable doubt that by omitting Palestinian Islamic Jihad and the Islamic Committee for Palestine from his list of organizations of which he was a member (or with which he was affiliated), Damrah provided a false statement on his Form N–400.

Additionally, a rational jury could conclude, based upon the strength of the connection between Damrah and Al–Arian and upon Damrah's willingness to involve himself in the organizations' major fund-raising affairs, that Damrah knew that the Form N–400 required him to disclose his ties with ICP and PIJ. This remains true despite the fact that the wiretaps occurred several months after Damrah filled out the Form N–400. The Court notes that the jury also saw videotapes of PIJ/ICP functions where Damrah both introduced high-ranking leaders of the organizations and actively solicited donations. The events depicted in these videotapes transpired in 1991. From the fact that Damrah involved himself in the fund-raising activities of the ICP and the PIJ as early as 1991 and as late as 1994, a reasonable jury could draw the inference that his connections with the organization were continuous over that period. Thus, a reasonable jury could conclude beyond a reasonable doubt that Damrah knew that he was a member of (or affiliated with) PIJ and/or ICP in October

1993 (when he filled out his Form N–400) and in December 1993 (when INS Agent Kim Adams conducted Damrah's naturalization interview). Additionally, the fact that Part 9 of Form N–400 clearly instructed Damrah to list his ties to "every organization," provides further reason for a jury to conclude that Damrah knew that the form required him to list his affiliations with PIJ/ICP.[15]

■ Finally, a reasonable jury could conclude beyond a reasonable doubt that Damrah's answer to Form N–400, Part 9 was material to the naturalization process. The Court instructed the jury that materiality is an element of a 18 U.S.C. § 1001 violation. More specifically, the Court instructed the jury:

> Under the second element, the false statement must be material, meaning it has a natural tendency to influence, or is capable of affecting or influencing, a decision or action of the federal agency. To be "material" it is not necessary that the false statement, in fact, influence or deceive a government agency. The test is whether the false statement has the capacity to impair or pervert the functioning of a governmental agency. In other words, a misrepresentation is material if it relates to an important fact as distinguished from some unimportant or trivial detail.

The jury watched as evidence a video in which Damrah stated that the ICP and the PIJ are one and the same, but that the group has to call itself "the Islamic Committee for Palestine" in the U.S. "for security reasons." Gov't Exh. 8–5. This statement indicates a recognition that PIJ was a group with aims hostile to aims of the U.S. Government. Further, the jurors heard evidence from Government terrorism expert Matthew Levitt that PIJ engaged in various acts of violence aimed at Israelis, and also watched a tape in which Damrah praised such acts of violence and specifically stated that members of PIJ committed the specific acts he mentioned. From this evidence, a rational jury could conclude beyond a reasonable doubt that membership in PIJ/ICP would have a natural tendency to influence the INS's final determination regarding an applicant's naturalization.

To recap, a rational jury could conclude beyond a reasonable doubt that (1) Damrah's failure to list his membership in PIJ/ICP amounts to a false statement; (2) Damrah omitted this information knowingly and willfully; and (3) whether Damrah was a member of (or affiliated with) PIJ/ICP was material to the naturalization procedure.[16] Therefore, a rational jury could conclude beyond a reasonable doubt that Damrah made false statements to the INS in violation of 18 U.S.C. § 1001(a), and therefore obtained naturalization unlawfully in violation of 18 U.S.C. § 1425(a).

Damrah may protest that all this evidence still does not amount to concrete proof that he was a member of PIJ. In a sense, he is right. The Government's case was weaker than the broad majority of criminal cases this Court has heard. No

---

**15.** The Court recalls that at trial, Damrah's attorneys attempted to argue that because the space provided in which to answer the question was so minimal, a reasonable applicant would not have known to list every organization of which he was a part. The above-referenced instructions belie this argument, as does the last sentence of the instructions: "If additional space is needed, use separate paper."

**16.** The only additional element to an offense of 18 U.S.C. § 1001(a) is that the statement pertained to an activity over which the federal government had jurisdiction. Damrah does not—and indeed could not—challenge the federal government's jurisdiction over immigration and naturalization. The Government therefore indisputably meets this element.

doubt, the Government's ten year delay in bringing this charge contributed to this. Before 1994, the Government wiretapped Damrah's calls with Al–Arian. Presumptively, the Government knew that Damrah's response to the immigration questionnaire was false near the time he made the statements. Yet the Government delayed bringing charges associated with the information it received from those wiretaps until 2003.

At trial, the Government never offered into evidence a PIJ or ICP membership card bearing Damrah's name or visage. Nor did it offer an oath of allegiance to PIJ and/or ICP bearing Damrah's signature. However, the Government does not need open-and-shut evidence to cross the threshold beyond which a rational jury could conclude that Damrah was a member of ICP and/or PIJ. The Supreme Court recognized as much in *Killian v. U.S.*, when (in a case involving a defendant's ties to the Communist Party) it stated:

> The phrases "member of" and "affiliated with," especially when applied to the relationship between persons and organizations that conceal their connection, cannot be defined in absolute terms. The most that is possible, and hence all that can be expected, is that the trial court shall give the jury a fair statement of the issues[,] ... give a reasonable definition of the terms and outline the various criteria, shown in the evidence, which the jury may consider in determining the ultimate issues.

368 U.S. 231, 258, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). As this passage makes clear, the Court was well within its bounds in sending to the jury the issue of whether Damrah lied by answering the "affiliation" question in the negative.

For the reasons described above, the Court concludes that the Government's evidence was sufficient to support a guilty verdict in the instant case. Damrah's mo-

tion for a verdict of acquittal on this basis is therefore DENIED.

## II. Rule 33 Motion for a New Trial

In addition to his motion for a judgment of acquittal, Damrah moves the Court, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33. Damrah offers two primary arguments in support of this motion. First, he argues that the verdict is against the great weight of the evidence. Second, he argues that prejudicial errors of law in the Court's prior orders, including its decision to admit the aforementioned videotapes into evidence, justify a new trial. The Court rejects both of these arguments for the reasons described below.

Before delving into those reasons, however, the Court recites the standard governing its review of a Rule 33 motion. The Rule states that the Court may "grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). Sixth Circuit precedent grants broad discretion to the trial judge in determining whether to grant such a motion. *See, e.g., United States v. Barlow,* 693 F.2d 954, 966 (6th Cir.1982). With this discretion in hand, the Court turns to Damrah's arguments.

## A. The Weight of the Evidence

■ The decision to grant a new trial on grounds of the verdict's being against the great weight of the evidence "is a discretionary matter." *United States v. Ashworth,* 836 F.2d 260, 266 (6th Cir.1988). However, precedent circumscribes the circumstances in which such discretion is appropriately exercised: "The Court should exercise such discretion only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Id.* Here, the Court finds that the verdict was not against the great weight of the evidence. Certainly, the evidence that the Government offered at trial

does not *compel* a guilty verdict. However, as described above in the Court's analysis of Damrah's insufficiency of the evidence argument, the Court finds ample evidence upon which to base a guilty verdict. The Court thus rejects this argument.

### B. Prejudicial Errors of Law

Finally, Damrah argues that the Court should grant him a new trial because of various allegedly prejudicial errors of law during the pretrial period and at trial. He does not explain how the majority of the various rulings cited in his brief were erroneous, let alone prejudicial. Lacking a reason to believe these rulings were in error, the Court rejects Damrah's unsupported arguments.

■ In addition to these unsupported arguments, Damrah offers an argument worthy of more consideration. He argues that the Court should grant a new trial based on its decision to admit into evidence the videotapes and DVDs offered by the Government. According to Damrah, these tapes were not sufficiently authenticated under Federal Rule of Evidence 901. Damrah argues that the Government failed to authenticate the tapes with testimony of either (1) someone who attended the events depicted in the videos (to testify that the videotapes accurately depicted what was said and done); or (2) the camera's operator (to testify that the film was properly installed and that the camera functioned properly).

The videos in question, referenced throughout this opinion, depict various PIJ/ICP rallies in the early 1990s. The Government obtained them in 1995, when it raided Dr. Sami Al–Arian's home and business premises. Damrah concedes that the evidence offered at trial establishes that the Government preserved the tapes intact since 1995, yet argues that because the Government lacked evidence of how the tapes were handled prior to 1995, the Court erred by admitting them. He further emphasizes that the tapes were edited and spliced, hinting that they may have therefore been misleading.

The Court concludes that it did not err by admitting the tapes. Case law on the prerequisites for admitting videotaped evidence is sparse. However, the Court notes two relevant decisions. First, in *United States v. Goldin,* the Third Circuit rejected a defendant's argument that where a videotape is edited, its proponent must call to the stand the tape's editor to authenticate the tape. 311 F.3d 191, 197 (3d Cir.2002). Similarly, in *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966 (2d Cir.1985), the Second Circuit rejected the civil defendants' challenge based on the trial court's decision to admit a videotape depicting an illicit transfer of cash. Rejecting this challenge, the court emphasized that the challengers did "not argue that the tape was inaccurate in any way or that [the videotape] had been altered since the date of recording." *Id.* at 973.

Like the challenger in *Spencer Handbags,* Damrah does not argue that the videos do not accurately depict the events that transpired at the PIJ/ICP rallies. Indeed, such an argument would be nearly foolish at this point, as prior to trial he stipulated to the accuracy of the translations (from Arabic to English) of videos. Additionally, Government terrorism expert Matthew Levitt offered testimony identifying some of the other participants in the rally as leading figures in the PIJ/ICP. (*E.g.,* Tr. 544–47, 552.) From this testimony, the Court is satisfied that the videos fairly depict the actual events that took place at the rallies.

As to Damrah's insinuation that the "editing and splicing" of the tapes may have

rendered them misleading, the Court notes that he was free to put on as evidence more complete versions of the tapes. Damrah could have subpoenaed Dr. Sami Al–Arian to produce additional materials or to testify that the tapes, as offered, were misleading. He chose not to do so and is thus in no position to complain that the Government's presentation of the tapes offered a less-than-complete picture. If his complaint is that the tapes were edited and spliced not by the Government, but rather prior to the time the Government obtained them in 1995, that argument strains credulity. Why would Sami Al–Arian, a participant in some of the tapes and a leading figure in PIJ/ICP, edit the tapes so as to make the group appear more nefarious than it is? The Court can think of no reason, and thus remains firm in its conclusion that the tapes fairly and accurately (although perhaps not completely) depict the events they purport to depict, editing and splicing not to the contrary.

## CONCLUSION

For the reasons described above, the Court DENIES both Damrah's motion for a judgment of acquittal and his motion for a new trial.

IT IS SO ORDERED.